Collins, Judge,
delivered the opinion of the court:
By opinion of this court, entered on July 16, 1965,[1] count two of the above-titled case was dismissed pursuant to the Government’s motion for summary judgment. A like motion was denied as to count one; this phase of the case was returned to Trial Commissioner Bernhardt, pursuant to Buie 47, for a determination of the amount of plaintiff’s recovery.[2] Blount Bros. Constr. Co. v. United States, 172 Ct. Cl. 1, 348 F. 2d 471 (1965). Plaintiff’s disagreement with the commissioner’s findings and recommendations brings the case to our attention once again.
The point of disagreement is a narrow one. It concerns a dispute as to the amount of undischarged or lost overhead due plaintiff’s second-tier subcontractor, General Metals Company (hereinafter referred to as General Metals), as a result of a Government-issued hold order suspending plaintiff’s work on its “wavemaker” contract during the period March 1, 1957, to February 28, 1958. Although we reach a different figure from that recommended by the commissioner, we accept, in large measure, his approach to the problem.
Performance of the contract in issue commenced in January 1957 with completion anticipated by February 1958. On February 19, 1957, a hold order was issued by the Department of the Navy, Bureau of Yards and Docks — the contracting agency — which remained in effect until February 7, 1958, at which time work was ordered resumed. *38 Thereafter, General Metals completed the balance of the contract. Entitlement to recover the additional delay costs resulting from the stated suspension was resolved in our earlier decision in this case. As stated, the problem now is to find a means of allocating General Metals’ “hold-order-period” overhead between the work then in progress and its suspended wavemaker contract.[3]
In its initial approach to the problem, plaintiff had taken the position that an appropriate allocation could be made simply by apportioning the total hold-order-period overhead {i.e., $284,823.28 [4]) between the amount of lost sales {i.e., $313,723, the balance remaining on the suspended wavemaker contract) and the total of all other sales for this same period {i.e., $831,829.51). This suggested allocation formula proceeds on the premise that had the Government not suspended the wavemaker contract, General Metals would have been able to enlarge its sales by the corresponding amount, and this $313,723 worth’ of additional performed work would, in turn, have absorbed its proportionate share of the established overhead (i.e., $284,823.28).
In rejecting this approach, the commissioner correctly pointed out that had General Metals not experienced its “lost” sale, that is, had it been permitted to work on the wavemaker contract without interruption and thereby increase its sales for the period by the stated amount {i.e., $313,723), then, in such event, its actual overhead costs would likewise have increased. Thus, the flaw in plaintiff’s reasoning was the assumption that recorded sales (here meaning performed work) could be increased without any change in operating costs. Further, and as our commissioner also noted, this method of allocation was defective in another sense — namely, it excluded from the list of contracts, to *39 wbicb overhead was chargeable, the so-called “tunnel” contract.
This latter contract, which General Metals entered into at the same time that it undertook performance upon the wavemaker, involved the construction of a steel tunnel (a project related to the wavemaker). But, unlike the wave-maker, actual construction of the tunnel was a matter which General Metals contemplated achieving through subcontractors (although in this it was never successful). The record shows that, unlike the usual subcontract, General Metals expended considerable administrative effort in attempting to secure the satisfactory fulfillment of the tunnel project. Its activities, which ran the gamut from the purchasing of supplies to the participation in numerous negotiations designed to secure a relaxation of the contract’s specifications, were of a magnitude sufficient to have contributed significantly to the total overhead incurred during the hold order period. In seeking to exclude the tunnel contract from the list of overhead chargeable contracts, plaintiff was clearly wrong.
As an alternative to plaintiff’s unacceptable approach, the commissioner decided upon an historical one, i.e., to compare General Metals’ normal or average operating costs with those obtaining during the hold-order period and treating the percentage difference between the two as the measure of its unabsorbed overhead during the base period.
This established, as the ratio of overhead to sales, an average operating cost of 29.24 percent for a given 5-year period,[5] compared with a 34.24 percent operating cost during the hold-order period. The resulting difference of 5 percent, computed against total hold-order-period overhead, yields a sum of $41,591.48. This, then, represents the total amount of excess or unabsorbed overhead which General Metals sustained during the time that performance on its wavemaker contract had been suspended. And while this figure is different from that which either party had initially put forth, *40 both have since agreed to accept it as the total amount available for allocation. Thus, there remains, at this point, the question as to what percentage of the $41,591.48 should be allotted to each of General Metals’ two contracts. On this issue, the parties differ drastically.
The commissioner’s solution, which defendant would now have us accept, divides the $41,591.48 in amounts proportionately equal to the respective dollar values of the two contracts. The idled portion of the wavemaker contract ($313,723) was allocated 57.33 percent of the $41,591.48 (i.e., $23,844.40), while the undelivered tunnel contract (representing a $233,500 sale) was allocated 42.67 percent of the total (i.e., $17,747.08) [6] This allocation we cannot accept because it treats, as equal, two contracts which, from the standpoint of overhead allocation, must receive differentiation.
Broadly speaking, the concept of overhead comprises two categories of expenses. The first, which we shall term “home office” overhead includes, inter alia, secretarial and administrative expenses, and the second category, which we refer to as “factory burden” or “factory overhead,” includes, inter alia, depreciation on manufacturing equipment, rent, fuel, maintenance, and power. By their nature, these expenses are continuous in the sense that they are incurred and must be paid even, in circumstances like the present, where actual performance of work has been temporarily halted. To be sure, these expense items are not fixed, for as work increases so also does overhead, but it is their existence, even in the absence of actual contract performance, which makes them a factor properly cognizable as an element of delay damages. Insofar as the plaintiff’s wavemaker contract is concerned, overhead allocation should be directed towards satisfying both categories. However, the same does not obtain with respect to the tunnel contract.
*41 As to this latter contract, it would be improper to allocate to it overhead expenses arising out of (or otherwise related to) General Metals’ “factory burden” because the actual performance of this contract was to be undertaken not by General Metals, but rather by General Metals’ subcontractor. It is the latter company (i.e., General Metals’ subcontractor) whose factory burden would alone be relevant. Stated otherwise, we are saying that, in a subcontract situation, the “factory burden” allocable to the contract involved is determined not by reference to the prime contractor’s “factory burden” expenses, but rather by the one who is to do the work. Further, in such a situation, the prime contractor may properly allocate to his subcontracted work only that portion of his overhead expenses which relates to his general or home office overhead.
The need for discrimination, which the foregoing considerations compel, has led us to reject the method of allocation originally relied upon. [Reference to total dollar contract values, as the guide to be used in allocating unabsorbed overhead, furnishes a fair means of division only so long as the contracts are to reflect the same underlying expense categories. But where, as here, the allocation of undischarged overhead to one contract must accommodate both overhead categories, while the second contract is to reflect only the expenses relating to home office overhead, then another means of overhead allocation must be chosen.
Though we can distinguish the elements to be considered (at least by way of definition), the problem of constructing an acceptable allocation formula remains. Since General Metals’ overhead records combine (without segregation) both its factory and its administrative expenses, a precise allocation is impossible. Under these circumstances, with the fact of damage having been established, a jury verdict can suffice. Specialty Assembling & Packing Co. v. United States, 174 Ct. Cl. 153, 184, 355 F. 2d 554, 572 (1966); Dale Constr. Co. v. United States, 168 Ct. Cl. 692, 729 (1964).
In our view of the matter, a fair and reasonable allocation may be achieved by apportioning the $41,591.48 along the lines suggested, that is, by allocating two-thirds of the total amount of unabsorbed overhead to the wavemaker contract *42 and the remaining one-third to the tunnel contract. Thus, $27,727.65 would represent the amount of General Metals’ overhead attributable to general administrative expense and factory burden expense (both being properly chargeable to the wavemaker contract because performance of this contract was to be by General Metals) and $13,868.83 would represent the amount of its administrative overhead pertaining to the subcontracted tunnel work.
We are aware, of course, that this tripartite division does not accord with actual working experience. In this case, where the record shows that General Metals devoted much administrative attention to its subcontracted tunnel work, its home office overhead on this contract would certainly exceed the home office overhead experienced on the idled wavemaker contract. Though here treated as equal, in fact, they are not. But offsetting this distortion is the fact that factory burden expense — which is an overhead item that generally exceeds home office overhead — has, through our division, been reduced.
Though lacking in precision, the balance thus stricken suggests a degree of fairness. That consideration, in the absence of any sounder solution, must be the basis upon which we rest the matter. Accordingly, judgment is entered for the plaintiff in the amount of $27,727.65.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. This action arises out of a contract entered into by plaintiff and the Department of the Navy, Bureau of Yards and Docks, calling for construction by plaintiff of a rotating arm and maneuvering basin at the David W. Taylor Model Basin, Carderock, Maryland. The claim set forth in plaintiff’s petition is made on behalf of General Metals Company, Inc. (sometimes referred to as plaintiff), a second-tier subcontractor responsible for manufacturing a component known as the wavemaker valve drive assembly (hereafter referred to as the wavemaker contract). *43 2. General Metals began work on the wavemaker contract in January 1957 and anticipated completing the work by February 1958. On February 19, 1957, a hold-order was issued by the contracting agency on this work and remained in effect until February 7, 1958, at which time General Metals Company was directed to proceed. Thereafter, General Metals completed the balance of the work by January 1959 and the work was accepted and paid for by the Navy.
3i. On the same date that plaintiff undertook the sub-subcontract for fabrication of the wavemaker, it also entered into a sub-subcontract with Green Fuel for the fabrication of a steel tunnel (hereinafter referred to as the tunnel contract) . With the exception of $466.97 worth of direct labor, all of the production on this contract was done by plaintiff’s subcontractors outside of plaintiff’s plant. However, unlike the usual subcontract, considerable work was done by plaintiff’s personnel in procuring supplies and attempting to negotiate with Green Fuel and the Navy for relaxation of the specifications which the plaintiff’s subcontractors were finding difficult to meet. The wavemaker (for $375,087) and tunnel (for $233,500) contracts were the largest jobs that plaintiff had ever had.
4. The question of whether plaintiff is entitled to recover additional costs resulting from the stated suspension of work was previously considered by the court on defendant’s motion for summary judgment, and, in its decision issued July 16, 1965, the court found that under a supplemental agreement with plaintiff the Bureau of Yards and Docks had agreed to pay the costs attributable to delays resulting from the hold-order. The question involved here is the determination of the overhead costs sustained by General Metals Company as a result of the suspension of work by the Navy. Because of the fact that General Metals accounts are maintained on a monthly basis, it was stipulated between counsel for the parties that the period from March 1,1957 through February 28, 1958 would be used for the purpose of determining damages allocable to the hold-order period.
5, The General Metals contract was entered into with Green Fuel Economizer Company, the first-tier subcontractor, *44 in the amount of $375,087. During the suspension period the company was able to complete a portion of the work and received payment for this portion of the work in the amount of $61,364. Consequently, the amount of the deferred work during the hold-order period was $313,723. Plaintiff contends that as a result of the suspension of work order General Metals lost sales during the hold-order period amounting to $313,723 which it could not make up in other sales, and as a consequence the proportionate amount of the company’s overhead which would have been allocable to this amount of lost sales represents lost overhead. In other words, plaintiff contends that if the hold-order had not been imposed General Metals would have performed an additional $313,723 worth of work in the period in question, and since it was deprived of this amount of additional sales the total overhead cost burden should be distributed on a proportionate basis between actual sales and lost sales. Under this theory plaintiff computed overhead damages of $89,091.12. In addition plaintiff claims 10 percent additional for handling costs and 6 percent profit for the prime contractor for total damages claimed of $103,880.23.
6. Plaintiff erred in the above-described overhead computation because it is not in accordance with sound accounting practice. This computation, which is based on lost sales, assumes that all plaintiff’s overhead expense items would be the same regardless of whether the contract was produced or remained in an idle status. This assumption is incorrect since overhead expense varies with the amount of work produced, although not necessarily at the same rate. Plaintiff has failed to distinguish between which overhead expense items were fixed and continued at the same rate whether idle or producing, and which of these expenses varied with the work produced. Further, plaintiff makes no allocation in the computation for overhead on the tunnel contract which required considerable administration but produced no sales. (See Finding 13.) Plaintiff’s claim for an additional 10 percent handling costs and 6 percent profit for the prime contractor, which plaintiff attempted to insert in its claim *45 a/fc the time of trial, fails for lack of reasonable proof. For the reasons stated plaintiff’s method of computing its damages is rejected.
7. Defendant contends that plaintiff had no lost sales during the idle period, and, therefore, no other work would have been manufactured in the factory space devoted exclusively to the idled wavemaker contract. For this reason, it maintains plaintiff’s damages are restricted to the direct costs of plaintiff’s occupying factory space for the period in suit. Defendant computes plaintiff’s alleged “occupancy” cosits as $3,466.43. These “occupancy” costs consist of the direct charges of 27.39 percent of three overhead accounts, namely, Building Rental, Heat Light and Power, and one-half of Depreciation, after reduction by $6,853.85 as an amount not applicable to Government contracts.
8. (a) Defendant’s contention that plaintiff lost no sales and thus could not use the factory space devoted to the wave-maker contract on other work is contrary to the weight of the evidence which reveals that during the period in suit there was an increase in factory space in January 1957 for this job, whereas there was a decrease in sales for the period in suit immediately following, compared with other comparable periods. The evidence indicates that plaintiff either refused to bid on jobs, or deliberately quoted prohibitively high prices, or extended delivery dates beyond customer requirements, in order not to be awarded such contracts. This fictional bidding was carried on to retain the good will of past customers for future business. In addition, plaintiff further curtailed its attempts to get other commercial business because of the large liquidated damages article of the contract which was set at $2,250 per day; thus plaintiff held its plant in readiness on a day-to-day basis.
(b) Even assuming there were no lost sales, defendant’s computation of alleged “occupancy” costs is so narrowly construed as to be contrary to good accounting practice, inasmuch as it limits plaintiff only to the alleged direct costs of occupancy but allows no portion of the normal allowance for other overhead items. These consist, in part, of indirect *46 labor for maintenance, repairs and security (patrol service), as well as material costs for repairs and maintenance, and such other overhead items usually allocable to all direct charges such as Office Salaries, Officers’ Salaries, Legal and Accounting, Local Taxes and Licenses, and others.
(c) For these reasons defendant’s computation of damages is rejected.
9. The parties have submitted sufficient evidence upon which to base a proper computation of overhead damages as a valid alternative. This evidence consists of plaintiff’s total sales and overhead expenses during the idle period, as compared with the total sales and overhead for the five-year period surrounding this idle period (i.e., two years and five months prior, and two years and seven months following the idle period in suit). The parties are in agreement upon the amounts shown for these years as disclosed by plaintiff’s books and records. However, defendant has deleted from overhead certain items which it contends do not apply to Government contracts. Plaintiff stipulated to all these deletions except for advertising which it disputes. Accounts deleted by stipulation were Officers’ Life Insurance, a portion of Depreciation and Amortization, Interest Expense, Freight Out, and Bad Debts.
10. Plaintiff’s Executive Vice President, Mr. Homig, contended that his bookkeeper incorrectly included at least $3,300 of office supplies in advertising. These allegedly included printing bills and letterheads. Plaintiff has presented no probative evidence showing such incorrect postings to the advertising account, nor has it presented any of the alleged incorrectly posted vouchers for defendant’s examination or audit. Thus, plaintiff’s unsupported statement of incorrectly posted advertising expenses falls for lack of proof. Further, plaintiff has failed to segregate from its books and records such advertising as help-wanted ads or directory listings which might be allowable under the proper Armed Services Procurement Regulations (ASPE), but instead claims the entire amount in the advertising account as a properly allowable overhead cost. This is erroneous, as the applicable *47 ASPR’s require that advertising other than as described above should be deleted from overhead attributable to Government contracts.
XL (a) Plaintiff seeks to exclude from overhead the executive bonuses and retroactive salary increases paid in years when good earnings were recorded, while defendant insists such bonuses be included in the overhead expenses for comparative purposes. Such bonuses were paid in three of the five comparable years while none was paid in the year of the idled wavemaker contract. The evidence indicates that the ASPR covering such bonuses allows them as proper overhead expenses only where they are reasonable in amount and are pursuant to an agreement entered into in good faith between the contractor and his employees before the services are rendered or pursuant to an established plan followed by the contractor so consistently as to imply, in effect, an agreement to make such payment.
(b) Plaintiff paid employees certain annual bonuses which are not in issue here. In issue are $70,000 in bonuses paid in three years to two stockholding executives of plaintiff corporation. An amount of $20,000 of the above $70,000 was for a retroactive salary increase for these two executives ($10,000 each) at the conclusion of one fiscal year for that one year only; for all intents and purposes it is similar to a bonus. Not only are such bonuses not reasonable in amount from the standpoint of their chargeability to Government contracts, but the evidence indicates they were not paid pursuant to any agreement which would, in effect, imply an agreement to pay such bonuses. These bonuses are, in effect, a distribution of profit, not an overhead expense, and properly should be deleted from overhead expenses for comparative purposes. They are not ordinary or necessary expenses of this company but are a management decision much the same as product advertising, large donations, or officers’ life insurance. For the reasons set forth above these bonuses will be deleted herein from properly computed overhead for comparative purposes.
12. The following is a schedule of plaintiff’s sales and overhead for the hold-order period in suit, with deletions from *48 overhead found applicable, compared with the 5 years surrounding the critical period:

Item Hold-Order Period, Five Tears

Sales_ $831, 829. 51 $4, 809,940. 83
Overhead (per boohs)-325,268. 80 1,603, 961. 06
Less — Expenses not allocable to Government contracts:
Total expenses deleted per stipulation (Fd. 9)-28, 880. 36 96, 700.29
Advertising (Fd. 10)-11,565.16 30,6Y8. 80
Bonuses (Fd. 11)-70, 000. 00
Allocable overhead-284, 823.28 1,406, 581.97
Ratio of overhead to sales-34.24% 29. 24%
Excess overhead ratio in hold-order period_ 5%
Excess overhead expended in hold-order period (5 % X $831,829.51) — $41, 591.48
13. (a) The parties agree that, under the above computation of excess overhead which is based on the ratio of overhead to sales, the excess overhead properly found applicable to the wavemaker contract should include an adjustment downward from the above computation to account for overhead work performed on the tunnel contract during the hold-order period, for which there were no sales, inasmuch as the tunnel contract was eventually canceled by the prime contractor. There is, however, a wide divergence of opinion between the parties as to the proper method and amount to allow for this tunnel contract. The tunnel contract was entered into the same date as the wavemaker contract, and after fruitless efforts to manufacture the tunnel via three subcontractors, General Metals found it could not meet the tolerances required, and its contract was canceled by Green Fuel in February 1958. Thus, plaintiff’s activity with regard to this contract was generally within the year that the wavemaker contract was idle, and the year for which plaintiff sues. Plaintiff admits that it expended considerable activity on the tunnel contract in connection with the problems of its subcontractors and their attempts to perform this contract. The tunnel contract file was extremely voluminous, was contained *49 in a large file drawer, and consisted of quantities of paper. It was not a normal subcontract, but required substantial administration, including purchasing and billing by plaintiff. Tn this way it differed from the wavemaker contract, which idled a portion of plaintiff’s factory and equipment but apparently required little administration during the idle period.
(b) Plaintiff computed its overhead on the tunnel contract based on estimates of the time spent by certain employees whose salaries totaled $1,050. Plaintiff allowed an additional $1,000 for miscellaneous costs, for an estimated total of $2,000 for overhead on the tunnel contract. Defendant, on the other hand, allocated overhead on this tunnel contract on the same basis as the wavemaker contract. Defendant contends that even though this was a subcontract, it was not operated strictly as a subcontract in that plaintiff did the purchasing, billing, and coordinated the efforts of suppliers and subcontractors, conferring with the Government and the prime contractor in an effort to achieve performance under the water tunnel contract.
Defendant’s allocation is as follows:

Item Amount Percent

Idled portion of Wavemaker contract- $313, 723 57.33
Undelivered Tunnel contract_ 233,500 42.67
Additional possible sales- 547,223 100. 00
14. The evidence persuades that plaintiff’s estimate of overhead on the tunnel contract is unrealistically low. The evidence further indicates that plaintiff’s administrative activity on this tunnel subcontract was probably greater than on a normal contract even though only about $500 of direct shop labor was expended by plaintiff.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is therefore entered for plaintiff in the amount of twenty-seven thousand seven hundred twenty-seven dollars and sixty-five cents ($27,727.65).

 As amended by order of September 28, 1965.

 While the ascertainment of damages would normally require a remand to the Armed Services Board of Contract Appeals, defendant, for reasons of practicality, consented to a resolution of the factual issues by the court.

 To accommodate the monthly bases upon which General Metals maintained Its boohs, the hold-order (or base) period has, by stipulation, been adjusted to March 1, 1957, through February 28, 1958. Also, in this connection, It should be pointed out that the problem of allocating overhead stems from the fact that General Metals’ boohs do not reflect the amount of monthly overhead chargeable to each worhing contract.

 The figure we use is that arrived at by our commissioner. It reflects a downward adjustment of plaintiff’s overhead, based upon the deletion of certain unallowable overhead expenses.

 The 5-year period encompassed 2 years and 5 months immediately preceding the hold-order period and 2 years and 7 months immediately succeeding it.

 The allocation can be set out in this fashion :

Item Amount Percent

Idled portion of -wavemaker contract_ $313, 723 57. 33
undelivered tunnel contract_ 233, 500 42. 67
Additional possible sales. 547, 223 100. 00