**TOWN CENTER MANAGEMENT
CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 720–87C.

United States Court of Federal Claims.

Aug. 29, 1994.

Marion Edwyn Harrison, Washington, DC, for plaintiff.

Jeri K. Somers, Washington, DC, with whom was Sharon Y. Eubanks, Asst. Director, David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., and Stuart Gerson, Asst. Atty. Gen., U.S. Dept. of Justice, for defendant; Gerald Schrader, Asst. Gen. Counsel, Gen. Services Admin., of counsel.

## OPINION

SMITH, Chief Judge.

This case is before the court on the parties' cross-motions for summary judgment. Plaintiff appeals a General Services Administration Board of Contract Appeals (GSBCA) decision denying plaintiff certain upward adjustments in rent claimed under the escalation clause contained in a written lease agreement between plaintiff and defendant. Plaintiff seeks reversal of the GSBCA opinion and a remand to the General Services Administration (GSA) with instructions to allow in full plaintiff's escalation claims totaling $1,612,620.00. Alternatively, plaintiff requests that this court enter judgment in its favor in that amount. Defendant requests that the court deny plaintiff's motion, dismiss plaintiff's complaint, and grant summary judgment in its favor.

After a careful review of the record, and after oral argument, this court must uphold the GSBCA's decision and, accordingly, grant summary judgment in favor of defendant.

## FACTS

On February 19, 1971, the General Services Administration, signed a 20 year lease with Town Center Management Corporation (TCMC) for office space in a building complex known as the "Waterside Mall and Waterside Office Towers." The Environmental Protection Agency (EPA) has been the tenant since 1971. The lease contained an escalation clause providing for rental adjustments of the annual rental rates at fixed yearly

intervals.[1] The controversy arose in April, 1984, when GSA auditors, attempting to establish the rental rate for the 1982–1987 period,[2] audited TCMC's books relating to their escalation claims. The auditors disputed four categories of operating costs TCMC claimed should be included in determining the rental rate: (1) Mall Cleaning ($89,555.00), (2) Central Maintenance Payroll Expense ($43,412.00), (3) Building Engineer and/or Manager Expense ($189,273.00), and (4) Parking Lot/Garage Expense ($23,128.00). The GSA disallowed these claims in full. TCMC appealed to the GSBCA. The GSBCA found that (1) TCMC included costs expressly excluded under the lease, and (2) that TCMC failed to produce sufficient evidence to justify a higher rental rate. Thus, it upheld the GSA decision. Plaintiff, invoking the Wunderlich Act,[3] sought the review of this court.

## DISCUSSION

Plaintiff claims that the GSBCA's decision is not supported by substantial evidence. According to plaintiff, defendant failed to present any pertinent evidence at the GSBCA hearing. Additionally plaintiff claims that the GSBCA failed to consider the relevant evidence presented by plaintiff, choosing instead to adopt the GSA's interpretation of the escalation clause. Defendant claims plaintiff has failed to prove that any of the Board's factual or legal conclusions are unsupported by substantial evidence or erroneous as a matter of law.

## I. GSBCA'S CONCLUSIONS OF LAW

In a Wunderlich Act case, the reviewing court has the authority to review *de novo* the board's conclusions of law. *See Vista Scientific Corp. v. United States,* 808 F.2d 50, 51 (Fed.Cir.1986); *Timber Access Industries Co., Inc. v. United States,* 553 F.2d 1250, 213 Ct.Cl. 648, 654 (1977). However, a board's interpretations of a contract are to be given careful consideration and a great deal of deference. *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed. Cir.1985), *citing George Hyman Construction Co. v. United States,* 564 F.2d 939, 944, 215 Ct.Cl. 70 (1977). This court finds that the Board's legal conclusions were based upon a sound interpretation of contract law. The Board considered all the documents that constitute the contract, rather than isolate particular terms or render certain portions of the lease meaningless. *See Fortec* at 1292; *United Pacific Insurance v. United States,* 497 F.2d 1402, 204 Ct.Cl. 686, 694 (1974). In its "Findings of Fact," for example, the Board concluded that the lease agreement consisted of the terms of TCMC's letter offer dated January 27, 1971, as amended by

1. The escalation clause provided as follows:

   The resultant lease will provide that at the end of the first five years, first ten years and at the end of the first 15 years of Government occupancy, the annual rental rate will be adjusted (unless the Government elects to take over performance of such services hereinafter provided) to provide for increases or decreases in operating costs (See Schedule C) furnished by the Lessor in the Government leased area as a part of the rental consideration, excluding exterior and structural maintenance and repair, window cleaning, lawn and landscaping maintenance and snow removal. Said operating costs, and the initial base from which adjustments shall be made for janitorial and cleaning services and supplies; maintenance and repairs and/or provision for the heating system, airconditioning system, electrical system, elevator system, plumbing system, replacement of bulbs, tubes, ballasts and starters, interior maintenance, building engineer or engineers related to staff, and social security and workmen's compensation insurance shall be determined through negotiations prior to commitment and contained in the commitment letter. The base from which the upward or downward adjustments in the rent will be made shall be the "per net usable square feet" costs as above provided or as amended for each five year period. Neither the operating costs base nor the adjustment shall include any fines, penalties, interest or cost added thereto for nonpayment or for delay in payment beyond any discounted period, nor any profit or home office overhead.

2. The costs upon which escalation claims are based were incurred between September 30, 1977 and October 1, 1982.

3. Under 41 U.S.C. §§ 321–322 (1988), a government contract decision rendered by a department or agency head or his duly authorized representative or board "shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." ("Fraudulent" has been interpreted to mean "fraudulent."). *See, e.g., Opalack v. United States,* 5 Cl.Ct. 349 (1984).

TCMC's letter of February 12, 1971, and the government's acceptance letter dated February 19, 1971. *GSBCA No. 8319–REM at 2.* Accordingly, in its analysis of plaintiff's "parking lot/garage" expense, the Board cited language from both the escalation clause and TCMC's February 1971 letter. The court can find no error in this.

■ The Board also correctly interpreted the terms of the lease agreement using their ordinary meaning, rather than adding a gloss or attempting to glean the subjective intentions of a particular party. *See ITT Arctic Services Inc. v. United States,* 207 Ct.Cl. 743, 754, 524 F.2d 680, 684 (1975). In reaching its decision regarding plaintiff's "central maintenance payroll" expense, for instance, the Board relied heavily upon the common definition of the term "overhead." GSBCA No. 8319–REM at 6. Although plaintiff urges that the Board's refusal to consider the parties' past conduct was clear error, this court finds to the contrary. Plaintiff has failed to establish that the contract is ambiguous. The only evidence plaintiff submitted regarding the contract's ambiguity is the Board's statement that the escalation clause is "poorly written." GSBCA Op. at 5. Such language does not, however, mean that the Board was unable to find clear and controlling language on the specific issues to be resolved. Therefore the parties' prior conduct, even if inconsistent with the terms of the lease, is irrelevant. *See Alaska American Lumber Co. v. United States,* 25 Cl.Ct. 518, 527 (1992), citing *Sylvania Electric Products, Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1995 (1972).

### 1. *Parking Lot/Garage Expenses*

■ Plaintiff claimed a $23,128 expense for "parking lot/garage" expenses. The GSA auditors excluded this cost from the escalation pool. The GSBCA upheld this decision.

The Board's first reason for excluding this expense was that, by the terms of the lease, costs incurred from maintenance and repair work are excluded from the pool. This con-

clusion is supported by the testimony of plaintiff's own witness at the June 1990 hearing. In response to questioning by defendant's counsel, Philip Friedman, TCMC's Treasurer and Chief Financial Officer stated that the parking expenses were "probably for cleaning, painting—maybe even a small amount of repair." *See GSBCA No. 8319–REM Transcript, June 12, 1990 at 139.* As the Board noted in its decision, the escalation clause states that "costs associated with exterior structural maintenance and repair, window cleaning, lawn and landscaping maintenance and snow removal" are excluded from the escalation pool. Thus, the Board correctly concluded that plaintiff's $23,128 parking and garage costs were, in actuality, a cleaning and repair expense, and thus not part of the escalation pool.

Furthermore, a letter written by plaintiff and incorporated into the lease agreement,[4] provides that "operating cost escalation ... will exclude parking areas." Thus, even if the Board erred in its characterization of this expense, it did not err in excluding it from the escalation pool.

### 2. *Building Engineer/Manager Expenses*

■ Plaintiff claimed, and the government did not object, that the salaries of building engineers and staff were part of the escalation pool for the 1982–1987 period. Plaintiff also claimed, however, an expense in the amount of 3% of the government's annual rent for "building engineer and/or manager" costs. The total claimed expense amounted to $189,273. The Board concluded that the charge was indistinguishable from overhead and therefore refused to include them in the escalation pool.

By the express language of the agreement between plaintiff and defendant, office overhead is excluded from the escalation pool: "[n]either the operating costs base nor the adjustment shall include any fines ... nor any profit from home office overhead." The lease agreement does not define "home office overhead." As neither party alleges that the

---

4. Both the Contracting Officer and the GSBCA found that a February 12, 1971 letter written by plaintiff to defendant constituted an amendment to the lease. Plaintiff appears to dispute this

finding, Pl.Br. at 16. The court will defer to the agency's conclusions regarding the documents which form the contract.

term is ambiguous, the court must assume its plain ordinary meaning. *See Whelan v. United States*, 529 F.2d 1000, 208 Ct.Cl. 688, 693 (1976).

"Home office overhead" has been interpreted by the courts to include those administrative expenses which (1) relate to the general management and conduct of the business and (2) are continuous in nature. *See Martin J. Simko Construction, Inc. v. United States*, 11 Cl.Ct. 257, 294 (1986), *vacated on other grds*, 852 F.2d 540 (Fed.Cir.1988); *Blount Brothers Construction Co. v. United States*, 180 Ct.Cl. 35, 40, 1967 WL 8928 (1967) At the hearing before the Board, plaintiff explained this charge as paying for the salaries of its corporate officers and secretaries, and their office expenses. There is no question that these expenses relate to general administrative costs and are continuous in nature. The court, therefore, agrees with the Board's conclusion that they are indistinguishable from overhead and therefore must be excluded from the escalation pool.

### 3. *Central Maintenance Payroll Expense*

During the period at issue, plaintiff delegated out its maintenance and repair work to its wholly-owned subsidiary, Town Center Management Central Maintenance (Central Maintenance). Central Maintenance did not maintain headquarters or an administrative staff separate from that of plaintiff, and its books did not reflect costs for office rent, telephones, receptionists, switchboards, and bookkeeping. The $43,412 figure cited by plaintiff for "Central Maintenance Payroll Expense" represents its estimate of the costs incurred in providing these services to Central Maintenance. Plaintiff arrived at this amount by taking 15% of the total payroll costs of performing repair and maintenance work in the government-occupied areas. The auditors disallowed it on the grounds that the underlying costs represented home office overhead and that the percentage used was

an arbitrary rate. The Board affirmed the auditors' conclusion and denied plaintiff recovery for this expense.

The Board's decision to exclude the $43,412 figure from the escalation pool is both legally sound and logically correct. The underlying expenses are indistinguishable from home office overhead, an expense clearly excluded by the terms of the lease. They reflect not the cost of servicing the premises by plaintiff, but rather, the costs incurred in the operation of Central Maintenance's home office. The testimony offered by plaintiff's own expert witness before the GSBCA provides ample support for this conclusion.[5]

Furthermore, plaintiff produced no credible evidence that plaintiff's use of a 15% rate was a reasonable approximation of the costs incurred in maintaining government-occupied space. While plaintiff contends that the industry standard is even higher, it offered no proof to this effect. Thus, even if plaintiff were correct in assuming that central maintenance costs are distinguishable from overhead, it would have no basis for recovery based upon the percentage used.

## II. GSBCA'S FACTUAL FINDINGS

In a Wunderlich Act case, the Court of Federal Claims functions as a purely appellate tribunal. *Vista Scientific Corp. v. United States*, 808 F.2d 50, 52 (Fed.Cir. 1986); *Hydromar Corp. of Delaware and Eastern Seaboard Pile Driving, Inc. v. United States*, 25 Cl.Ct. 555, 558, *aff'd without op., Hydromar Corp. of Delaware v. Defense Logistics Agency*, 980 F.2d 74 (Fed.Cir.1992). While an agency board's legal conclusions may be reviewed *de novo*, its factual findings are binding on the court unless they are "fraudulent or capricious or arbitrary or so grossly erroneous as to imply bad faith," or if they are unsupported by substantial evidence. *Vista* at 51; *Titan Pacific Construction Corp. v. United States*, 17 Cl.Ct. 630, 632 (1989), *aff'd without op.*, 899 F.2d 1227 (Fed.

---

5. Arnold Schwartz, a Certified Public Accountant, testified that although he would characterize these costs as "indirect costs," overhead is a component of such costs. Additionally, Mr. Schwartz stated that the only way to insure that indirect costs do not include overhead is by looking at each individual item and making a determination as to each one. Mr. Schwartz acknowledged, however, that this had not been done with respect to the claimed central maintenance expenses.

Cir.1990). Substantial evidence is that which can "convince an unprejudiced mind of the truth of facts to which the evidence is directed." *Hydromar Corp.* at 558, citing *Koppers Co. v. United States,* 186 Ct.Cl. 142, 149, 405 F.2d 554 (1968). The court must consider both the evidence supportive of the board's findings and the evidence that refutes its findings, and may make a finding contrary to that of the board only when the "overwhelming weight of the evidence" supports such a conclusion. *Gulf Contracting, Inc. v. United States,* 23 Cl.Ct. 525, 528 (1991), *aff'd without op.,* 972 F.2d 1353 (Fed.Cir.1992).

This court finds no evidence that the GSBCA's factual findings were arbitrary, capricious, or not supported by substantial evidence. To the contrary, the court finds the Board's factual findings to be amply supported by documentary and testimonial evidence. The court therefore affirms the Board's factual findings.

*Mall Cleaning Expense*

█ Plaintiff included in the escalation pool $89,555 for amounts spent on cleaning common areas, including lobbies, concourses, corridors, entrance ways and parking areas. The GSA excluded this figure from the escalation pool on the ground that it included costs incurred from both government and non-government occupied areas. The GSBCA affirmed.

The Waterside Mall and Office Towers consists of two twelve floor office towers separated by a building varying from three to four stories in height. With the exception of the ground floor, each floor of both the building and the towers are occupied by the E.P.A. The ground floor of the building consists of a mall area occupied by approximately thirty commercial establishments. Most are located on a large public concourse that is accessible from the street. Below the mall is a parking area. Some of the parking spaces are leased by defendant and some are not. It is the cleaning of these areas, as well as some government-occupied areas on the first floor [6] for which plaintiff based its claim for "mall cleaning" expenditures.

6. The government leases areas on the ground floors for use as a print shop, mail room, trash

The GSBCA found that there was "some evidence" that part of the money spent on "mall cleaning" was incurred in cleaning government-occupied areas. It also found, however, that the "great bulk" of the mall cleaning account reflected costs incurred in cleaning the "high traffic public concourse areas" that serviced the retail stores. The Board concluded, therefore, that plaintiffs mall cleaning expenses did not go into the escalation pool because they were not incurred with respect to space occupied by the government.

The Board's conclusions are not clearly erroneous. The government's evidence indicated that a government employee could not enter the mall area from the upper floors of the building without going outside the building. Government personnel, therefore, were not dependent upon passing through the mall area to reach their places of employment. The evidence also demonstrated that together the five government areas located on the concourse area comprised merely 77% of the square footage of the mall's Safeway store. In light of this fact, and the fact that there are approximately thirty-three commercial establishments in the mall area, it is not unreasonable for the Board to conclude that a vast majority of the mall cleaning expenses were related to the cleaning of non-government areas.

It is true that at least a portion of the mall cleaning account is attributable to costs incurred in cleaning government-occupied areas. The Board did not neglect to consider this fact. Because plaintiff maintained only one account for all of its mall cleaning expenses, however, the Board could not determine the amount expended on cleaning government-occupied areas and whether this amount exceeded the amount attributable to cleaning other areas. Plaintiff's failure to produce evidence segregating its government from non-government related expenses, coupled with the evidence indicating that a large majority of the costs were incurred with respect to areas not leased by defendant,

room, photo lab, loading dock and supply store.

provides more than a reasonable basis for the Board's conclusion.

## CONCLUSION

Based upon the foregoing, the court must deny plaintiff's motion for summary judgment and grant defendant's motion for summary judgment. The Clerk of the Court is directed to enter judgment in accordance with this opinion.

**IT IS SO ORDERED.**