Per Curiam :
This case was referred to Trial Commissioner Bichard Arens with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 57 (a). The commissioner has done so in an opinion and report filed on August 12, 1968. Plaintiff filed a notice of intention to except to the commissioner’s report on September 10,1968. However, on December 13,1968, plaintiff filed a motion for permission to withdraw its notice of intention to except and further moved that the court adopt the commissioner’s report as its findings of fact and opinion. On December 17,1968, defendant filed a motion agreeing and concurring in plaintiff’s request that the commissioner’s report be adopted by the court.
Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby grants the aforementioned motions of the parties, and adopts the said opinion, findings and recommended conclusion of law as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $4,540.
OPINION OP COMMISSIONER
Arens, Oommissioner:
Plaintiff, a general construction contractor, seeks remission of liquidated damages assessed *839 against it and costs which it incurred after substantial completion of a 183 dwelling unit project which it constructed in Washington, D.C., under a contract entered into in April 1958, with the National Capital Housing Authority (sometimes hereinafter referred to as the Authority).
No administrative appeal from any decision of the contracting officer was provided for in the contract. The parties accordingly proceeded in this court by trial de novo. Under the circumstances of this case, the decision of the contracting officer is not entitled to Wunderlich Act finality and the resolution of the factual issues is to be made on the basis of a preponderance of the evidence before the court. L. Rosenman Corp. v. United States, 182 Ct. Cl. 586, 390 F. 2d 711 (1968); Earl N. Davis, Trustee of Astrotherm Corp. v. United States, 180 Ct. Cl. 20 (1967). The factual issues, which constitute the bulk of the controversy, are set forth in detail and resolved by ultimate findings in the accompanying findings of fact, and are, therefore, only outlined in this opinion.
The work to be performed under the contract was divided into two groups which were to be “progressively completed, suitable and ready for occupancy” within the prescribed number of consecutive calendar days, and plaintiff was liable for liquidated damages for each calendar day of delay until the work was completed or accepted. Plaintiff was not to be charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond its control and without its fault or negligence, including “unusually severe weather.” The contract contained a disputes clause and other provisions, hereinafter alluded to in connection with relevant subject matter.
Liquidated Damages
Paving of Sayles Place (finding 5). The contracting officer granted plaintiff 130 days’ extension of contract time for completion of group 1 buildings due to delay caused by a paving contractor, but granted no extension of contract time for completion of group 2 buildings. The testimony of both plaintiff’s and defendant’s witnesses establishes, however, that *840 tbe delay of tbe work on group 1 buildings interfered witb tbe planned sequence of tbe operations witb a resultant delaying effect on the work on group 2 buildings. Plaintiff claims that it should have been granted 70 days’ extension of contract time for completion of group 2 buildings, but, as set forth in finding 5(f), 15 days’ extension is found to be warranted. Adams v. United States, 175 Ct. Cl. 288, 358 F. 2d 986 (1966); Blount Bros. Constr. Co. v. United States, 180 Ct. Cl. 35 (1967).
Weather delays (finding 6). Plaintiff requested tbe contracting officer for an extension of contract time of 128 days because of “extreme weather conditions,” but tbe contracting officer, after comparing the weather conditions during tbe months of the contract work with the weather conditions during similar months of a preceding eight-year period, granted 22 days’ extension for each group of buildings. Plaintiff contends that “from the testimony and exhibits, particularly the Government’s daily records, the project was delayed by adverse weather conditions for a substantially longer period than granted by the contracting officer”; but, as stated in finding 6(b), the evidence adduced by plaintiff regarding weather delays was vague and fragmentary, and does not establish that it was entitled to an extension of the contract time for a period longer than that allowed by the contracting officer. Banks Constr. Co. v. United States, 176 Ct. Cl. 1302, 364 F. 2d 357 (1966).
Vandalism (finding 7). Section 26 of the General Conditions provided in part:
26. CARE OE WORK
a. The Contractor shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work and shall be responsible for the proper care and protection of all materials delivered and woi*k performed until completion and final acceptance, whether or not the same has been covered by partial payments made by the Authority, and whether or not the damage to his work was caused by the Contractor or by other contractors or by others than the employees of the Authority in the course of their employment.
*841 b. In the event of delay in completion of the contract work due to loss or damage caused by failure of the contractor to adopt reasonable and continuous protective methods, the contractor shall not be relieved from payment of liquidated damages because of such delay.
In denying plaintiff’s request for an extension of contract time because of delay due to vandalism, the contracting officer emphasized that it was not defendant’s responsibility under the contract to protect the project from theft or damage while it was in the hands of the contractor, and that there was no requirement in the contract for an extension because of delay due to vandalism. In reaching this conclusion, it is clear that the contracting officer was in error because the contract provisions which exonerated plaintiff from liquidated damages because of any delays in the completion of the work “due to unforeseeable causes beyond its control and without its fault or negligence,” do not depend upon fault or responsibility of defendant. Moreover, when one couples this language with the contract language which provided that the contractor should not be relieved from payment of liquidated damages because of delay caused by failure of the contractor to adopt reasonable and continuous protective methods, the conclusion is inescapable that if the delay was because of the above-described unforeseeable causes and was not caused by failure of the contractor to adopt the protective methods, then the contractor was entitled to be relieved from payment of liquidated damages. The contract is, of course, to be interpreted so as to harmonize all provisions wherever it is reasonable to do so. Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 351 F. 2d 972 (1965); Bishop Engr. Co. v. United States, 180 Ct. Cl. 411 (1967). In preparing its bid, plaintiff anticipated that there would be some vandalism, and during the construction period, plaintiff had two or three watchmen on duty at all times. In addition, plaintiff alerted the Police Department “to keep watch as much as they could.” Nevertheless, the evidence is clear and uncontradicted that there was extensive vandalism on the project, including approximately $4,000 to $5,000 in damage to window glass, and that plaintiff was delayed by the van *842 dalism. As set fortli in finding 7(d), plaintiff adopted reasonable and continuous protective methods, but was delayed by vandalism which was unforeseeable, beyond its control and without its fault or negligence, to the extent of five days on both group 1 and group 2 buildings.
Errors in Drawings (finding 8). The contracting officer denied plaintiff’s request for an extension of the contract time because of delay which plaintiff asserted was due to errors in the drawings. As set forth in finding 8(b), the weight of the evidence establishes that there were no serious errors in the drawings, that the corrections to the drawings were handled expeditiously and that the errors in the drawings did not cause plaintiff any significant delay in the overall progress of the work. Connolly-Pacific Co. v. United States, 175 Ct. Cl. 134, 358 F. 2d 995 (1966) ; Commerce International Co. v. United States, 167 Ct. Cl. 529, 338 F. 2d 81 (1964).
Lowering of Sheridan Road (finding 9). The essential facts were stated by the contracting officer as follows:
18. As to the seventh cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay of landscape work because of erection of retaining wall along Sheridan Eoad in front of Buildings A-2 and B-l, and for which an extension of 10 days is requested * * * I find the facts, as they apply to Group 2, to be as follows:
The lowering of Sheridan Eoad in front of Group 2 buildings and site necessitated the construction of a retaining wall in front of Buildings A-2 and B-l but the wall was constructed long after Buildings A-2 and B-l were accepted. Buildings A-2 and B-l could have been accepted January 27, 1960 along with Buildings D-5 and B-2 but there was no access to the buildings which could only be entered from the front or Sheridan Eoad side. When the Highway Department completed Sheridan Eoad at the point opposite the north end of Building D-5, the Contractor was able to install steps and lead walk which gave access to Buildings A-2 and B-l at that point, and consequently the Authority accepted them February 8, 1960, 12 calendar days after acceptance of Buildings D-4 and B-2. The Contractor *843 is therefore entitled to 12 days’ delay on Buildings A-2 and B-l and site and landscape work because of Highway Department delays in regrading Sheridan Boad. The Highway Department raised the grade at the intersection of Sheridan Boad and Pomeroy Boad, and in each direction from the corner, which necessitated the rebuilding of a catch basin and construction of curb and gutter and repaving of road at this point to deflect water into the catch basin. The Authority was aware of this problem and that it would require regrading of the site to raise it at that location and removal of paving, raising of grade and repaving a portion of the play area at that location. However, until the District of Columbia completed their work we could not complete the grading and landscaping in this area. Immediately upon completion of the District Highway Department’s work the Contractor and grading and landscaping subcontractors proceeded with their respective work, all of which was com-
gleted June 16,1960 and the site and landscaping of ■roup 2 was accepted subject to completion of site and landscape work, when the retaining wall, to be constructed in front of Buildings A-2 and B-l should be completed. Therefore, the Contractor is entitled to 94 calendar days’ extension on site and landscape work because of delay of the District of Columbia in raising the grade at the intersection of Sheridan and Pomeroy Boads and construction of catch basin and curb therewith and repaving of the intersection.
Based on the foregoing facts is [sic] is my determination as Contracting Officer for the Authority that the Contractor experienced 12 calendar days’ delay on Buildings A-2 and B-l and 106 (94 plus 12) calendar days' delay on site and landscaping of Group 2 because of unforeseeable causes beyond his control and without his fault or negligence, which delay was not concurrent with other delays for which the Contractor has been given an extension of time. * * *
20. As to the ninth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay on landscaping of Group 2, and on Buildings A-2, B-l, D-5, and B-2 because of the lowering of Sheridan Boad by the District of Columbia Highway *844 Department, and for which an extension of 120 days was requested, I find the facts, as they apply to Group 2, to be as follows:
The delay on site and landscape work on Group 2, and buildings A-2 and B-l, and extension of time therefor, is covered in Item 18 above. The lowering of Sheridan Eoad and raising of the intersection of Sheridan and Pomeroy Roads had no delaying effect on the completion and acceptance of Buildings D-5 and B-2 for use and occupancy. * * *
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced no delays because of the regrading of Sheridan and Pomeroy Roads beyond those covered in Item 18 above and for which extension of contract time has been granted thereon in Item 18 above. Therefore, no further time extension is granted herein under Item 20.
As set forth in finding 9(b), the weight of the evidence does not establish that the lowering of Sheridan Road and the construction of the retaining wall delayed construction of group 2 buildings, including the play areas and parking areas for a period longer than the period of the contract extension allowed by the contracting officer.
Acceptance of Buildings (finding 10). In addition to providing that the two groups of buildings were to be “progressively completed, suitable and ready for occupancy” within the prescribed number of days, the contract also contained the following pertinent provisions:
Paragraph 2 of Section 3 of the Special Conditions provided:
2. The Authority may accept any part of the work if there has been such a degree of completion as will, in its opinion, make such part reasonably safe, fit and convenient for the use and accommodation for which it was intended. Dwelling units so accepted by the Authority will not be subject to liquidated damages beyond the date of such acceptance.
Section 32. a. of the General Conditions provided:
32. INSRECTTON
a. All material and workmanship shall be subject to inspection, examination, or test by the Authority and *845 the Architect at any and all times during manufacture or construction and at any and all places, where such manufacture or construction is carried on. The Authority shall, have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected. Rejected material shall be promptly segregated and removed from the premises and satisfactorily replaced with proper material without charge therefor. If the Contractor fails to proceed at once with the correction of rejected defective material or workmanship, the Authority may by contract or otherwise have the defects remedied or rejected materials removed from the site and charge the cost of the same against any moneys which may be due the Contractor, without prejudice to any other rights or remedies of the Authority.
Section 84 of the General Conditions provided:
34. EINAL INSPECTION
a. When the work is substantially completed the Contractor shall notify the Authority in writing that the work will be ready for final inspection on a definite date which shall be stated in such notice. Such notice shall be given at least ten (10) days prior to the date stated for final inspection, and the notice shall bear the signed concurrence of the representative of the Authority having charge of inspection.
b. If the Authority determines that the state of preparedness is as represented it will make the arrangements necessary to have final inspection commenced on the date stated in such notice, or as nearly thereafter as is practicable.
Section 48 of the General Conditions provided in part:
48. GENERAL GUARANTY
Neither the final certificate of payment nor any provision in the contract nor partial or entire use of occupancy of the premises by the Authority shall constitute an acceptance of work not done in accordance with the contract or relieve the Contractor of liability in respect to any express warranties or responsibility for faulty materials or workmanship.
In response to plaintiff’s request for an extension of the contract time due to alleged delays in acceptance of the buildings, the contracting officer stated:
11. As to the tenth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating *846 to alleged delay by the Authority in accepting buildings for use and occupancy, and for wbicb an extension of 30 days was requested, I find tlie facts, as they apply to Group 1, to be as follows:
The Authority refused on this project, just as it has on all other projects, to accept any buildings for use and occupancy until they were brought to a satisfactory stage of completion and quality of workmanship to comply with the contract. Numerous punch lists were made on these buildings, and checked and re-checked by the project personnel representing the Architect and the Authority until satisfactory completion of contract work and punch list items. The Authority was constantly pushing the Contractor and his personnel to satisfactorily complete the buildings so that they could be taken over. A review of the memoranda of acceptance for occupancy will reveal that buildings were finally taken over subject to completion of miscellaneous work on exterior of buildings and site work and landscaping, and in some cases completion of interior work. If the Contractor’s supervisory personnel had been diligent in the satisfactory completion of contract required work and punch list items, the amount of punch listing would have been greatly reduced and the buildings could and would have been taken over sooner than they were. However, they failed to properly check and supervise the mechanics’ work, and, therefore, any delay is the Contractor’s responsibility.
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced no delay on the part of the Authority in accepting buildings for use and occupancy that was not caused by his personnel and, therefore, no time extension is granted. *
21. As to the tenth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to alleged delay by the Authority in accepting buildings for use and occupancy, and for which an extension of 30 days was requested, I find the facts, as they apply to Group 2, to be as follows:
For the reasons set forth in detail in Item 11 above, the Contractor is entitled to no extension for *847 alleged delays in acceptance of buildings for use and occupancy. * * *
Based on tbe foregoing facts it is my determination as Contracting Officer for tbe Authority that the Contractor experienced no delay on the part of the Authority in accepting buildings for use and occupancy for any reasons that were beyond his control and that were not caused without his fault or negligence and, therefore, no time extension is granted.
At the trial the evidence established that the buildings were “substantially” completed prior to acceptance by defendant. Plaintiff, apparently relying upon the above-quoted Section 34 of the General Conditions, claims that it should have been allowed an extension of the contract time “as a result of the failure of the defendant to inspect and accept the dwelling units when substantially completed.” A fair reading of Section 34 of the General Conditions and of the above-quoted paragraph 2 of Section 3 of the Special Conditions, however, compels the conclusion that when the work was substantially completed plaintiff was obliged to notify defendant of that fact, but that defendant was not then obliged to accept the buildings. The language of the Special Conditions is obviously permissive and embraces the exercise of discretion by defendant as to whether a building was reasonably safe, fit and convenient for the use and accommodation for which it was intended. Moreover, the buildings were, as previously indicated, to be “completed, suitable and ready for occupancy.” As set forth in finding 10 (i), the record does not support plaintiff’s contention that defendant’s inspectors were tardy in making inspections or that the inspections were unnecessary or improper, or that defendant failed to accept the buildings promptly after they were completed and ready for occupancy. Fox Valley Engr. Inc. v. United States, 151 Ct. Cl. 228 (1960).
Change Orders (finding 11). All of the change orders involved here contained a statement that an equitable extension of contract time would be considered separately. At the trial, defendant’s official who prepared the findings of fact for the contracting officer, now deceased, testified that in arriving at a conclusion as to the amount of the extension of *848 tbe contract time of 34 calendar days for group 1 change orders and of 49 calendar days for group 2 change orders, he first devised a formula by dividing the contract dollar amount by the contract days and then applied the formula in reaching the total amount of the extension of the contract time. He further testified that after he reached the conclusion, he conferred with representatives of the Public Housing Authority (which, under the contract, approved extensions of contract time) and that the PHA representatives expressed disagreement with the use of the formula. The PHA representatives then made a determination of the time extension to be allowed on each change order, which added up to the same total days extension for each of the two groups. The evidence does not disclose just how the PHA representatives arrived at their determination.
As set forth in finding 11(e), although at the trial plaintiff attacked the above-described formula, and on each of several change orders adduced evidence to the effect that a certain number of days were required for a subcontractor to complete the work under the change order, it failed to show how the change order affected either group of buildings or the project as a whole so as to justify additional extension of the contract time. Plaintiff, accordingly, failed to establish that it was entitled to additional time extensions because of change orders. See Connolly-Pacific Co. v. United States, supra.
Costs Incurred After Substantial Completion
In its petition, plaintiff alleges that defendant breached the contract by failing and refusing to accept the work when it was substantially completed, and that as a result, plaintiff incurred additional costs; but in view of the conclusion heretofore reached that the record does not support plaintiff’s contention that defendant failed to accept the buildings promptly after they were completed and ready for occupancy, this claim for additional costs is not sustained. (Finding 12(b).)
In applying the contract formula for liquidated damages and in accordance with the findings of fact on excusable *849 delay, plaintiff is entitled to recover the sum of $4,540. (Finding 18.)
Fiot>iN6s op Fact
1. (a) Plaintiff, a corporation duly organized under the laws of the District of Columbia and engaged in the general construction business, entered into a contract on April 17, 1958, with defendant, acting through the National Capital Housing Authority (hereinafter referred to as NCHA) for the construction in Washington, D.C., of 183 dwelling units to be known as Sheridan Terrace, for an initial total contract price of $2,151,000.
(b) Plaintiff claims entitlement to remission of part of $17,440 liquidated damages assessed against it and to $41,568.71 costs incurred after substantial completion of the project.
(c) No administrative appeal from any decision of the contracting officer was provided for in the contract. The parties, accordingly, proceeded in this court by trial de novo.
2. (a) The United States Public Housing Authority (hereinafter referred to as PHA) participated in the financing of the work under the contract, but had no contractual relationship with plaintiff; PHA maintained a project engineer on the site to see that NCHA stayed within the scope of the United States Housing Act (Pub. L. No. 412, 75th Cong., as amended), and to act as a liaison between NCHA and PHA. The project engineer was authorized to approve any single proceed order or change order involving not more than $3,000, but was not authorized to make any decision concerning time extensions.
(b) Because of financial difficulties encountered by plaintiff, its bonding company, New Amsterdam Casualty and Surety Company, was forced to make certain payments to plaintiff’s subcontractors, and, thereafter, filed suit against plaintiff to recover the amount of these payments. Plaintiff and the bonding company subsequently entered into a stipulated settlement pursuant to which plaintiff was released from liability for the sum of $125,000 which was paid by individual stockholders of plaintiff and not by plaintiff corporation.
*850 3. (a) Tbe work to be performed under tbe contract was divided into two groups. Section 2 of tbe Special Conditions provided:
SEC. 2. TIME FOR COMPLETION
1. Tbe work shall be commenced at tbe time stipulated in the “Notice to Proceed” to tbe Contractor and shall be fully completed within 545 consecutive calendar days.
2. Groups of dwelling units shall be progressively completed, suitable and ready for occupancy, including utilities as specified herein, heat, hot water, light, power, etc., sidewalks and driveways servicing such units, within the number of consecutive calendar days from the established starting date as follows:
(a) 101 units in first group comprising Buildings A-l, C-l, D-l, C-2, D-2, and D-3, and all other work in connection with this group except Lawns and Planting, within 365 calendar days.
(b) Lawns and Planting in first group of 101 units; 82 units in second group comprising Buildings D-4, A-2, B-l, D-5, and B-2 and all other work in connection with this group except Lawns and Planting, within 425 calendar days.
(c) Lawns and Planting in second groups of 82 units, within 545 calendar days.
(b) Paragraph 1 of Section 3 of the Special Conditions provided:
SEO. S. LIQUIDATED DAMAGES
1. As actual damages for any delay in completion are impossible of determination, the Contractor and his Sureties shall be liable for and shall pay to the Authority the sums hereinafter stipulated as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted.
a. Two dollars ($2.00) per dwelling unit per calendar day applicable to dwelling units, all as set forth in Secion [sic] 2 above.
b. Ten dollars ($10.00) per calendar day of delay in completion of Lawns and Planting, all as set forth in Section 2 above.
(c) Section 13 of the General Conditions provided in part *.
13. DELAYS — DAMAGES
* * * Provided, that the right of the Contractor to proceed shall not be terminated or the Contractor charged *851 with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to acts of God, or of the public enemy, acts of the Government, acts of the Authority, acts of another contractor in the performance of a contract with the Authority, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the Contractor shall within 10 days from the beginning of any such delay (unless the Authority, with the_ approval of the PHA, sbn.11 grant a further period of time prior to the date of final settlement of the Contract) notify the Contracting Officer in writing of the causes of delay, who shall ascertain the facts and the extent of delay, and the Authority shall, subject to prior approval of the PHA, extend the time for completing the work when in its judgment the findings of fact of the Contracting Officer justify such an extension, and his findings of fact thereon shall be final and conclusive upon the parties hereto.
b. No payment or compensation of any kind shall be made to the Contractor for damages because of hindrance or delay from any cause in the progress of the work, whether such hindrances or delays be avoidable or unavoidable.
(d) Section 15 of the General Conditions provided:
15. disputes
a. All disputes, other than those required to be handled under Section 44 of the General Conditions, arising under this Contract or its interpretation, whether involving law or fact, or both, or extra work, and all claims for alleged breach of Contract shall within 10 days of commencement of dispute be presented to the Contracting Officer for decision. A copy of the notice of the dispute shall be forwarded to the Field Office of the PHA. Such notice need not detail the amount of the claim but shall state the facts surrounding the claim in sufficient detail to identify the claim, together with its character and scope. In the meantime the Contractor shall proceed with the work as directed. The parties agree that any claim not presented within the time limit specified within this subsection is waived, except that if the claim is of a continuing character and notice of the claim is not given within ten days of its commencement, *852 the claim will be considered only for a period commencing ten days prior to the receipt by the Authority of written notice thereof.
b. The Contractor shall submit in detail his claim and his proof thereof. The decision of the Contracting Officer shall be approved in writing by the PHA prior to its issuance. Any decision not so approved shall be a nullity. Each decision by the Contracting Officer shall be in writing and shall be mailed to the Contractor by registered mail, return receipt requested. A copy shall be delivered to the Project Engineer.
c. If the Contractor does not agree with any decision of the Contracting Officer, he shall except from the final release the decision in question.
d. Provided the Contractor has:
(1) given notice of any dispute within the time limit stated in 15a. above;
(2) presented his dispute to the Contracting Officer;
(3) taken exception in his release from the Contracting Officer’s decision; and
(4) brought suit within 120 days after receipt of final payment under this Contract or within six months of a written request by the Authority that he submit a final voucher and release, whichever time is the lesser;
the Contracting Officer’s decision shall not be final and conclusive but the dispute shall be tried in court on its merits. In the event the above conditions precedent have not been met, the Contractor hereby agrees that his noncompliance with the conditions precedent constitutes a waiver of his right to assert said claim.
4. By letter dated April 25,1958, NCHA notified plaintiff to commence work under the contract at the start of business on April 28,1958. The letter further stated that since NCHA had not yet obtained title to the property east of Buildings A-2, B-l, and D-5, and north of B-2, the grading to the east and north of those buildings and construction of the buildings should not proceed until further notice; that it was anticipated that NCHA would obtain early title to the property ; and that if an extension of the contract time was warranted because of the time interval, a request for such extension would be considered.
*853 LIQUIDATED DAMAGES
5. Paving of Sayles Place:
(a) Defendant deleted from the contract work all of tbe public walks, curbs, gutters, and parking area entrances, and contracted for suck work with the Highway Department of the District of Columbia which sublet the work to a paving contractor.
(b) By letter, dated February 9, 1961, plaintiff requested an extension of contract time of 130 days for group 1 buildings and an additional extension of contract time of 130 days for group 2 buildings, because of delay to it caused by the paving contractor.
(c) By letter, dated April 13,1962, the contracting officer granted plaintiff 130 days’ extension of contract time for completion of group 1 buildings but granted no extension of contract time for completion of group 2 buildings. The letter stated in pertinent parts:
Notwithstanding that the Contractor did not notify the Contracting Officer in writing of certain delays within the 10-day limitation set forth in the section of the General Conditions, delays-damages, the Contracting Officer had intimate and personal knowledge through project records and job and office meetings, that certain delays did occur prior to ten days before the Contractor formally notified the Authority of said delays. PHA approval of the granting of a further period of time in excess of the aforesaid limitation is evidenced by PHA approval of the extension of contract time letter which is issued as a result of this findings of fact. ‡ $ $ $ $
3. As to the second cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay by the District of Columbia Highway Department in installing curbs, gutters, public sidewalks, and parking area aprons, and for which an extension of 130 days was requested, I find the facts, as they apply to Group 1, to be as follows:
The public walks, curb-gutters, and parking area entrance aprons were included in the general contract for the project but PHA required that they be deleted and that the items be installed by the District *854 of Columbia Highway Department in accordance with the Cooperation Agreement. Therefore, we had made certain arrangements with the District of Columbia Highway Department to install curb-gutters, public walks, and parking area aprons on the project and the contract therefor on this project, between the Highway Department and their contractor, was in effect and there was no reason for work not to proceed in May 1959 when our Contractor was ready for it, since the Highway Department had long since been alerted to the need. Actually the Highway Department contractor started grading for sidewalk along Sheridan Road August 17, 1959. The elapsed period from the Contractor’s notice of delay on May 18,1959 to the time the Highway Department completed its work on October 22, 1959 was 157 calendar days. If they had made a timely start on May 8,1959 (10 days before the Contractor’s notice of delay) and proceeded in an orderly manner, the work could easily have been completed in 37 calendar days. The Contractor was therefore, in effect, denied access insofar as the order and normal sequence of his work was concerned, and general construction progress was delayed through no fault of this Contractor. Therefore the Contractor is entitled to 130 calendar days’ delay based on the 157-days’ period from his notice of delay to the Highway Department completion of work, plus 10 days prior to his notice, less 37 days.
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced 130 calendar days’ delay on the buildings, site and landscaping because of unforeseeable causes beyond his control and without his fault or negligence, which delays were not concurrent with other delays for which the Contractor has been given an extension of time. * * *
* * * * *
13. As to the second cause of delay asserted by the Contractor in his letter of February 9,1961 * * * relating to delay by the District of Columbia Highway Department in installing curbs, gutters, public walks and parking area aprons therefor, and for which an extension of 120 days was requested, I find the facts, as they apply to Group 2, to be as follows:
*855 The only curb, gutter and. sidewalk required around Group 2 buildings and site were at the north end and west side of Building D-4. Two parking aprons were required at this location and in addition one on Sheridan Road between Buildings B-l and D-5 and one on Pomeroy Road between Buildings B-5 and B-2. All this work was completed October 22, 1959 and the last building in Group 2 to be turned over, Building D-4, was delivered by the Contractor March 1, 1960, or 131 days after completion by the District of Columbia of the curb, gutter, parking aprons and sidewalk. The first building in Group 2 was delivered 97 days after completion of District of Columbia work and the one parking area apron installed by the District adjacent to this building did not cause the 97 days’ delay. * * *
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor did not experience any delay on buildings, site and landscaping of Group 2 because of delay by the District of Columbia in installing curb, gutter, sidewalk, and parking aprons, and therefore no extension of time is granted.
(d) In this court plaintiff has reduced to 70 days the time which it claims the contracting officer should have extended the contract because of delays caused by the paving contractor to group 2 buildings.
(e) At the trial plaintiff’s president testified that the delay of the work on group 1 buildings had a delaying effect on the work on group 2 buildings because it interfered with the pi aimed sequence of the operations. Plaintiff’s expert witness, who had been NCHA’s project superintendent, testified that the delay of work on group 1 buildings would have “a delaying effect on the whole group, because it is a part of the whole.” Defendant’s expert witness, who had been PPIA’s representative at the job site, testified that a delay in group 1 of 130 days “would have its impact on group 2,” and that the extent thereof “would have to be analyzed.” The chief of the construction and engineering section of the project development division of NCHA, who frequently visited the project site during the construction, testified that there was *856 no delay to group 2 buildings because of the delay in group 1 buildings, but thereafter, under cross-examination, he qualified his testimony by stating that the premature movement of workmen from group 1 to group 2 areas and a change in the sequence of operations “would cause some disruption of the operations.”
(f) It is found that plaintiff was delayed on the buildings, site and landscaping in group 2 buildings a total of 15 calendar days because of the delay of the Highway Department of the District of Columbia in installing the public walks, curbs, gutters and parking area entrances, and that plaintiff’s delay in the completion of the group 2 work was due to unforeseeable causes beyond the control and without the fault or negligence of plaintiff and was not concurrent with other delays for which plaintiff was given an extension of time.
6. Weather delays.
(a) In his letter, dated April 18, 1962 (finding 5(c), supra), the contracting officer stated:
4. As to the third cause of delay asserted by the Contractor in his letter of February 9,1961, * * * relating to weather delays, and for which an extension of 128 days was requested, I find the facts, as they apply to Group 1, to be as follows:
The Contractor bases his request on “extreme weather conditions for the period of March 1958 through January 1959.” The Notice to Proceed was effective April 28, 1958 and although there was a total of 0.89" of rainfall on April 28 and 29, the rain occurred between the hours of 2 and 6 A.M. on the 28th and between the hours of 7 and 9 P.M. on the 29th, therefore, the months of March and April are not germane to this request. For purposes of further discussion we will consider a contract period of May through January 1958-59 in comparison with similar months in the preceding eight year period 1950-58. For simplicity the two periods will be referred to as “contract period” and “eight-year period.”
An analysis of the Weather Bureau reports for the eight-year period reveals an average snowfall of 8.52" against a snowfall of 4.9" for the contract period. The snowfall in the contract period did not *857 exceed the average of the eight-year period in any given month; therefore, the 'Contractor is entitled to no extension because of snowfall. The average rainfall for the eight-year period was 31.14", slightly in excess of the 30.41" for the contract period. However, analysis of individual months reveals that the average figure for July was 3.56" and for the contract period in July, 7.15" or 200% of the eight-year average. The average for August was 4.95" and for the contract period 6.49" or 131% of the average for the eight-year period. Therefore, it is my decision that the Contractor is entitled to five calendar days’ delay in July because of rain and two calender [sic] days in August, or a total of seven calendar days. The weather during the winter of 1958 was abnormally cold in this area. A tabulation of the official weather bureau reports for December, January and February reveals an average of 52.6 days during the eight-year period when the minimum temperature was 32° F. or below. The Weather Bureau reports for the contract period show a total of 67 days when the minimum temperature was 32° F. or below or an excess of 14.4 days over the average for the eight-year period. This precluded the laying of foundation block and subsequent work for the stated period throughout the project in the winter of 1958-59. * * *
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced 22 calendar days’ delay on buildings, site and landscape work on Group 1 because of unforeseeable causes beyond his control and without his fault or negligence, which delay was not concurrent with other delays for which the Contractor has been given an extension of time.
*****
14. As to the third cause of delay asserted by the Contractor in his letter of February 9,1961 * * * relating to weather delays, and for which an extension of 128 days was requested. I find the facts, as they apply to Group 2, to be as follows:
The delay relating to weather affected Group 2 in the same manner as it affected Group 1, for the reason that work was in progress on both groups. * * *
*858 Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced 22 calendar days’ delay on buildings, site and landscape work on Group 2 ¡because of unforeseeable causes beyond his control and without his fault or negligence, which delay was not concurrent with other delays for which the Contractor has been given an extension of time.
(b) The evidence adduced by plaintiff regarding weather delays was vague and fragmentary, and does not establish that it was entitled to an extension of the contract time for a period longer than that allowed by the contracting officer.
7. Vandalism.
(a) Section 26 of the General Conditions provided in part:
26. CARE OT WORK
a. The Contractor shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the.prosecution of the work and shall be responsible for the proper care and protection of all materials delivered and work performed until completion and final acceptance, whether or not the same has been covered by partial payments made by the Authority, and whether or not the damage to his work was caused by the Contractor or by other contractors or by others than the employees of the Authority in the course of their employment.
b. In the event of delay in completion of the contract work due to loss or damage caused by failure of the contractor to adopt reasonable and continuous protective methods, the contractor shall not be relieved from payment of liquidated damages because of such delay.
(b) In his letter, dated April 13, 1962 (finding 5(c), supra), the contracting officer stated:
6. As to the fifth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay caused by vandalism, theft, and malicious damage, and for which an extension of 15 days was requested, I find the facts, as they apply to Group 1, to be as follows:
It is a cardinal requirement that the Contractor take the necessary measures to protect himself from theft, vandalism, and other forms of damage. This is *859 ordinarily accomplished by keeping a watchman or watchmen on the project. Actually there were watchmen on the job and the amount of theft, vandalism, etc. was minor as compared with some of the other projects constructed for the Authority. In any case it is not the responsibility or a contract requirement of the Authority to protect the project from theft or damage while it is in the hands of the Contractor and under construction, and there is no requirement in the Contract either explicit or implied that the Authority will extend contract time for malicious damage, theft or other loss, and the additional work necessitated thereby.
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced no delays because of theft, vandalism, etc. for which the Authority is under obligation to extend contract time, and, therefore, there is no extension of contract time for this purpose.
* * * * *
16. As to the fifth cause of delay asserted by the_ Contractor in his letter of February 9,1961 * * * relating to delay caused by vandalism^ theft, and malicious damage and for which an extension of 15 days was requested, I find the facts, as they apply to Group 2, to be as follows:
For reasons set forth in Item 6, the Contractor is entitled to no extension of time on this request. * * *
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced no delays because of vandalism, theft, etc. for which the Authority is under obligation to extend contract time, and therefore there is no extension of time for this purpose.
(c) In preparing its bid, plaintiff anticipated that there would be some vandalism, and during the construction period, plaintiff had two or three watchmen on duty at all times. In addition, plaintiff alerted the Police Department “to keep watch as much as they could.” Nevertheless, the evidence is clear and uncontradicted that there was extensive vandalism on the project, including approximately $4,000 to $5,000 in damage to window glass, and that plaintiff was delayed by the vandalism.
*860 (d) It is found that plaintiff adopted reasonable and continuous protective methods, but was delayed by vandalism which was unforeseeable, beyond its control and without its fault or negligence, to the extent of 5 calendar days on buildings, site and landscape work on both group 1 and group 2 buildings, which delay was not concurrent with other delays for which plaintiff was given an extension of time.
8. Errors in Drawings.
(a) In his letter, dated April 13, 1962 (finding 5(c), supra), the contracting officer stated:
9. As to the eighth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay because of errors in planned dimensions, and for which an extension of 10 days is requested, I find the facts, as they apply to Group 1, to be as follows:
There were certain errors in dimensions on contract plans that required job coordination. We have not had a project yet that did not have dimensional errors requiring job coordination. There was a job superintendent representing the Architect and Authority on the job at all times, and a PHA project engineer. They were available eight hours every working day to coordinate and iron out, among other things, dimensional errors. It was their practice to discuss job problems with the Contractor’s superintendent, and if necessary discuss them with the Architect and Authority by phone, and render decisions without delay. Therefore, there was no delay encountered for this reason.
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced no delays on Group 1 buildings or site because of errors in planned dimensions, and no time extension is granted.
‡ ‡ #
19. As to the eighth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay because of errors in planned dimensions, and for which an extension of 10 days is requested, I find the facts, as they apply to Group 2, to be as follows:
*861 Tbe Contractor is entitled to no extension of contract time for reasons set forth, in detail in Item 9 above. * * *
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced no delay on Group 2 buildings or site because of errors in planned dimensions, and no time extension is granted.
(b) At the trial plaintiff’s president testified that “time was consumed” in the process of correction of certain errors in the drawings, and that “there were several days of delay before we could go ahead with the change.” The weight of the evidence establishes, however, that there were no serious errors in the drawings, that the corrections to the drawings were handled expeditiously and that the errors in the drawings did not cause plaintiff any significant delay in the overall progress of the work.
9. Lowering of Sheridan Boad.
(a) In his letter, dated April 13, 1962, the contracting officer stated:
18. As to the seventh cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay of landscape work because of erection of retaining wall along Sheridan Boad in front of Buildings A-2 and B-l, and for which an extension of 10 days is requested * * * I find the facts, as they apply to Group 2, to be as follows:
The lowering of Sheridan Boad in front of Group 2 buildings and site necessitated the construction of a retaining wall in front of Buildings A-2 and B-l but the wall was constructed long after Buildings A-2 and B-l were accepted. Buildings A-2 and B-l could have been accepted January 27, 1960 along with Buildings D-5 and B-2 but there was no access to the buildings which could only be entered from the front or Sheridan Boad side. When the Highway Department completed Sheridan Boad at the point opposite the north end of Building D-5, the Contractor was able to install steps and lead walk which gave access to Buildings A-2 and B-l at that point, and consequently the Authority accepted them February 8,1960,12 calendar *862 days after acceptance of Buildings D-4 and B-2. The Contractor is therefore entitled to 12 days’ delay on Buildings A-2 and B-l and site and landscape work because of Highway Department delays in regrading Sheridan Hoad. The Highway Department raised the grade at the intersection of Sheridan Road and Pomeroy Road, and in each direction from the corner, which necessitated the rebuilding of a catch basin and construction of curb and gutter and repaving of road at this point to deflect water into the catch basin. The Authority was aware of this problem and that it would require regrading of the site to raise it at that location and removal of paving, raising of grade and repaving a portion of the play area at that location. However, until the District of Columbia completed their work we could not complete the grading and landscaping in this area. Immediately upon completion -of the District Highway Department’s work the Contractor and grading and landscaping subcontractors proceeded with their respective work, all of which was completed June 16,1960 and the site and landscaping of Group 2 was accepted subject to completion of site and landscape work, when the retaining wall, to be constructed in front of Buildings A-2 and B-l should be completed. Therefore, the Contractor is entitled to 94 calendar days’ extension on site and landscape work because of delay of the District of Columbia in raising the grade at the intersection of Sheridan and Pomeroy Roads and construction of catch basin and curb therewith and repaving of the intersection.
Based on the foregoing facts is [sic] is my determination as Contracting Officer for the Authority that the Contractor experienced IB calendar days'1 delay on Buildings A-B and B-l and 106 (91¡, pT/ws IB) calendar days’ delay on site and landscaping of Group 2 because of unforeseeable causes beyond his control and without his fault or negligence, which delay was not concurrent with other delays for which the Contractor has been given an extension of time. * * *
20. As to the ninth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay on landscaping of Group 2, and on Buildings A-2, B-l, D-5, and B-2 because of the lowering of *863 Sheridan Eoad by the District of Columbia Highway Department, and for which an extension of 120 days was requested, I find the facts, as they apply to Group 2, to be as follows:
The delay on site and landscape work on Group 2, and buildings A-2 and B-l, and extension of time therefor, is covered in Item 18 above. The lowering of Sheridan Eoad and raising of the intersection of Sheridan and Pomeroy Eoads had no delaying effect on the completion and acceptance of Buildings D-5 and B-2 for use and occupancy. * * *
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced no delays because of the regrading of Sheridan and Pomeroy Eoads beyond those covered in Item 18 above and for which extension of contract time has been granted thereon in Item 18 above. Therefore, no further time extension is granted herein under Item 20.
(b) Plaintiff contends that the lowering of Sheridan Eoad “prevented access to the buildings for a substantial period of time” and “interfered with construction of the play areas and parking areas,” for which plaintiff claims that it was entitled to an additional extension of contract time on group 2 buildings. The weight of the evidence does not establish, however, that the lowering of Sheridan Eoad and the construction of the retaining wall delayed construction of group 2 buildings, including the play areas and parking areas for a period longer than the period of the contract extension allowed by the contracting officer.
10. Acceptance of Buildings.
(a) Paragraph 2 of Section 3 of the Special Conditions provided:
2. The Authority may accept any part of the work if there has been such a degree of completion as will, in its opinion, make such part reasonably safe, fit and convenient for the use and accommodation for which it was intended. Dwelling units so accepted by the Authority will not be subject to liquidated damages beyond the date of such acceptance.
*864 (b ) Section 82. a. of the General Conditions provided:
32. INSPECTION
a. All material and workmanship shall be_ subject to inspection, examination, or test by the Authority and the Architect at any and all times during manufacture or construction and at any and all places, where such manufacture or construction is carried on. The Authority shall have the right to reject defective material and workmanship or require its correction. Eejected workmanship shall be satisfactorily corrected. Eejected material shall be promptly segregated and removed from the premises and satisfactorily replaced with proper material without charge therefor. If the Contractor fails to proceed at once with the correction of rejected defective material or workmanship, the Authority may by contract or otherwise have the defects remedied or rejected materials removed from the site and charge the cost of the same against any moneys which may be due the Contractor, without prejudice to any other rights or remedies of the Authority.
(c) Section 34 of the General Conditions provided:
34. PINAL INSPECTION
a. When the work is substantially completed the Contractor shall notify the Authority in writing that the work will be ready for final inspection on a definite date which shall be stated in such notice. Such notice shall be given at least ten (10) days prior to the date stated for final inspection, and the notice shall bear the signed concurrence of the representative of the Authority having charge of inspection.
b. If the Authority determines that the state of preparedness is as represented it will make the arrangements necessary to have final inspection commenced on the date stated in such notice, or as nearly thereafter as is practicable.
(d) Section 48 of the General Conditions provided in part:
48. GENERAL GUARANTY
Neither the final certificate of payment nor any provision in the contract nor partial or entire use of occupancy of the premises by the Authority shall constitute an acceptance of work not done in accordance with the contract or relieve the Contractor of liability in respect to any express warranties or responsibility for faulty materials or workmanship.
*865 (e) In bis letter, dated April 13, 1962 (finding 5(c), supra), tbe contracting officer stated:
11. As to tbe tenth canse of delay asserted by tbe Contractor in his letter of February 9, 1961 * * * relating to alleged delay by the Authority in accepting buildings for use and occupancy, and for which an extension of 30 days was requested, I find the facts, as they apply to Group 1, to be as follows :
The Authority refused on this project, just as it has on all other projects, to accept any buildings for use and occupancy until they were brought to a satisfactory stage of completion and quality of workmanship to comply with the contract. Numerous punch lists were made on these buildings, and checked and re-checked by the project personnel representing the Architect and the Authority until satisfactory completion of contract work and punch list items. The Authority was constantly pushing the Contractor and his personnel to satisfactorily complete the buildings so that they could be taken over. A review of the memoranda of acceptance for occupancy will reveal that buildings were finally taken over subject to completion of miscellaneous work on exterior of buildings and site work and landscaping, and in some cases completion of interior work. If the Contractor’s supervisory personnel had been diligent in the satisfactory completion of contract required work and punch list items, the amount of punch listing would have been greatly reduced and the buildings could and would have been taken over sooner than they were. However, they failed to properly check and supervise the mechanics’ work, and, therefore, any delay is the Contractor’s responsibility.
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced no delay on the part of the Authority in accepting buildings for use and occupancy that was not caused by his personnel and, therefore, no time extension is granted.
21. As to the tenth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to alleged delay by the Authority in accepting *866 buildings for use and occupancy, and for which an extension of 30 days was requested, I find the facts, as they apply to Group 2, to be as follows:
For the reasons set forth in detail in Item 11 above, the Contractor is entitled to no extension for alleged delays in acceptance of buildings for use and occupancy. * * *
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced no delay on the part of the Authority in accepting buildings for use and occupancy for any reasons that were beyond his control and that were not caused without his fault or negligence and, therefore, no time extension is granted.
(f) On February 25, 1959, plaintiff and NCHA entered into an agreement, in which NCHA was referred to as the Authority, and which read as follows:
wheeeas, the Authority desires to accept for occupancy certain buildings of Sheridan Terrace, DC-1-31, which will be completed in advance of the entire contract work; and
whereas, the Contractor desires to be relieved of the maintenance of such buildings; and
whereas, it is desirable to clarify the relations of the parties:
therefore, it is agreed as follows :
1. Reference to the “Contract” shall mean the contract executed by the above parties on April 17, 1958, for the construction of one hundred eighty-three (183) dwelling units located on Sheridan Road between Howard and Pomeroy Roads, S.E., Washington, D.C., designated as Project DC-1-31.
2. The guaranty period called for in the Contract specifications, or any of the Contract documents, shall not begin to run until final acceptance of all work under the Contract.
3. The Authority will assume the insurance risk on such buildings as are accepted for occupancy under this agreement. The Contractor may cancel his builder’s risk and fire insurance carried on such buildings as of the date such buildings are accepted.
4. The acceptance for occupancy of any buildings by the Authority shall not constitute an acceptance *867 of work not performed in accordance with tbe Contract documents, or relieve the Contractor of liability to perform any work required by the Contract but not completed at the time of acceptance.
5. The Contractor shall not be responsible for wear and tear or damage to buildings and units resulting from acceptance for occupancy by the Authority.
6. The Contractor shall be relieved of all maintenance costs on all buildings accepted for occupancy under this agreement.
7. Utility services, including electric current, water and gas for the buildings accepted for occupancy from the time of such acceptance will be metered and paid for by the Authority or by the respective tenants as the case may be. The Contractor’s requirements for such services after said acceptance for occupancy for the completion of the remaining units shall be furnished by Mm at his own expense.
8. As each group of buildings nears completion, the Contractor shall notify the Authority in writing accordingly. Thereupon the Authority and the Contractor shall mutually agree upon a date when ■the buildings may be inspected for acceptance for occupancy. The Contractor shall be notified in writing by the Authority of the acceptance for occupancy of each group of buildings and the conditions with respect thereto.
9. The purpose of this agreement is solely to provide for acceptance for occupancy of completed buildings before total completion and final acceptance of the project, and it shall not relieve either party of any of its obligations under the Contract.
(g) In a series of five memoranda NCHA accepted buildings for use and occupancy as follows:
1. A-l, C-l, C-2, and D-l (51 units) on October 28, 1959.
2. D-2 and D-3 (50 units) on November 17, 1959.
3. B-2 and D-5 (44 units), but not the boiler room, on January 27,1960.
4. A-2 and B-l (16 units) on February 8, 1960.
5. D-4 (22 units) on March 1, 1960.
(h) At the trial plaintiff’s president testified that the group 2 buildings were 99% ready for occupancy on De *868 cember 1,1959, and that by January 5,1960, they were 99.7% completed; that plaintiff felt that under the terms of the contract, defendant should have accepted the buildings (apparently by the earlier date, but no later than by January 5, 1960), because the buildings were then substantially completed. He further testified that defendant’s inspectors were tardy in making inspections, made repeated inspections and numerous punch lists which were unnecessary and improper, and failed to accept the buildings promptly after they were ready for acceptance.
(i) Although the evidence clearly supports plaintiff’s contention that the buildings referred to were substantially completed at the times indicated, the record establishes that there remained much corrective work to be done and that the buildings were not completed and ready for occupancy. The record does not support plaintiff’s contention that defendant’s inspectors were tardy in making inspections or that the inspections were unnecessary or improper, or that defendant failed to accept the buildings promptly after they were completed and ready for occupancy.
11. Change Orders.
(a) Section lOh. of the General Conditions provided:
h. Subject to the provisions of Sections 11 [Claims for Extra Costs] and 13 [Delays-Damages] of the General Conditions justifiable extensions of contract time because of changes or extra work, authorized by proper written order, may be granted by the Authority which order shall be approved on its face by the PHA.
(b) Section lid. of the General Conditions provided:
d. If, on the basis of the available evidence, the Authority determines that an adjustment of the Contract price or time is justifiable, the procedure shall then be as provided herein for “Changes in the Work.”
(c) All of the change orders involved here contained a statement that an equitable extension of contract time would be considered separately.
(d) In his letter, dated April 13, 1962 (finding 5(c), supra), the contracting officer stated:
*869 7. As to tbe sixth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay caused by change orders, and for which an extension of 126 days was requested, I find the facts, as they apply to Group 1, to be as follows:
The Contractor has listed numerous change orders in Groups 1, 2, 3, 4 and 5, which groups refer to groups of buildings as accepted for occupancy and not contract groups. His group 1 and 2 compose contract group No. 1 and his groups 3, 4 and 5 cover contract Group 2. For purposes of this determination we will consider those change orders that were pertinent to contract group 1, in whole or hi part. First those change orders pertaining to group 1 within the series of Change Orders Nos. G-19 to G-32 inclusive, fall by date within the 130 day period of contract time extension contained in Item 3 above and are, therefore, concurrent therewith. There were three change orders, Nos. G-5, G-6, and G-17 covering latent soil conditions in Group 1 in the total dollar amount of $11,175.41, and there were five other change orders, Nos. G-2, G-12, G-18, G-34, and G-46 in the total amount of $16,322.97, pertaining to Group 1, which caused delays not concurrent with other delays for which the Contractor has been given an extension of time.
Progress of the work was under daily observation by representatives of this Authority and was found to be satisfactory. The work performed on these eight change orders for which extension of time is granted were [sic] not concurrent with each other. It is noted particularly that in connection with G-46 errors in establishing grades by the District of Columbia and/or by the Architect caused two separate major grade changes from the original. Delays for these eight Change Orders have been determined to be as follows: G-5,1 day; G-6,1 day; G-17,4 days; G-2, 1 day; G-12, 4 days; G-18, 3 days; G-34, 4 days; and G-46, 16 days — totalling 34 days.
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced 34 calendar days’ delay on buildings, site and landscape work on Group 1 because of unforeseeable causes beyond his control and without his fault or negligence, which delay was not concurrent with other *870 delays for which the Contractor has been given an extension of time.
« $ ‡ ‡ *
17. As to the sixth cause of delay asserted by the Contractor in his letter of February 9, 1961 * * * relating to delay caused by change orders, and for which an extension of 126 days was requested, I find the facts, as they apply to Group 2, to be as follows:
Of all the change orders listed under Item 6 of the Contractor’s letter, Change Order No. G-38 is not pertinent since the time was not left open thereon. Change Orders G-41 and G-48 covering the retaining wall along Sheridan Eoad did not affect the contract time since the Contractor had been relieved of any possible penalty by acceptance of the buildings behind the wall long before it was built. Change Order G-4-3 falls in the same category since it was performed after acceptance of site subject to performance of certain punch list items, and Change Order G-42 is treated separately in Item 18 below.
The delays of change orders in Group 1 * * * are common in application to Group 2 * * * and consist of the following: Change Orders G-5,1 day; G-6, 1 day; G-17,4 days; G-2,1 day; G-12,4 days; G-18, 3 days; G-34, 4 days; and G-46,16 days — totalling 34 days. In addition six other change orders apply to Group 2 and delays for these have been determined to be as follows: Change Order G-ll, 2 days; G-13, 1 day; G-24, 8 days; G-28, 2 days; G-36, 1 day; and G-39,1 day. These change orders total 49 days’ delay.
Based on the foregoing facts it is my determination as Contracting Officer for the Authority that the Contractor experienced 49 calendar days’ delay on buildings, site and landscape work on Group 2 because of unforeseeable causes beyond his control and without his fault or negligence which delay was not concurrent with other delays for which the Contractor has been given an extension of time.
(e) At the trial, the chief of the construction and engineering section of the project development division of NCHA, who prepared the findings of fact for the contracting officer, now deceased, testified that in arriving at the amount of the extension of the contract time of 34 calendar days for group *871 1 change orders and of 49 calendar days for group 2 change orders, he first devised a formula by dividing the contract dollar amount by the contract days and then applied the formula in reaching the total amount of the extensions of the contract time. He further testified that after he reached his conclusion, he conferred with PELA, representatives who expressed disagreement with the use of the formula. The PHA representatives then made a determination of the time extension to be allowed on each change order, which added up to the same total days’ extension for each of the two groups, namely, 34 calendar days for group 1 and 49 calendar days for group 2. The evidence does not disclose just how the PHA representatives arrived at their determination as to the number of days’ extension to be allowed on each change order.
(f) At the trial, plaintiff repeated the claims for entitlement to time extensions because of change orders, which it had previously made to the contracting officer, and attacked the formula testified to by the chief of the construction and engineering section of the project development division of NCHA. On each of several change orders, plaintiff adduced evidence to the effect that a certain number of days were required for a subcontractor to complete the work under the change order, but plaintiff failed to show how the change order affected either group of buildings or the project as a whole so as to justify additional extensions of the contract time. Plaintiff, accordingly, failed to establish that it was entitled to additional time extensions because of change orders.
COSTS INCURRED AFTER SUBSTANTIAL COMPLETION
12. (a) In its petition, plaintiff alleges that defendant breached the contract by failing and refusing to accept the work when it was substantially completed, and that as a result, plaintiff incurred additional costs in the amount of $41,568.71 for heat, electricity, and labor, supervision and similar items of expense.
(b) In view of the conclusion in finding 10 (i) that the record does not support plaintiff’s contention that defendant *872 failed to accept the buildings promptly after they were completed and ready for occupancy, plaintiff’s claim for additional costs is not sustained.
Ultimate Finding
13. Plaintiff is entitled to recover liquidated damages assessed as follows:
(a) Paving of Sayles Place: 15 (days) x 82 (units) x $2, or $2,460; and 15 (days) x $10, or $150. The total: $2,610.
(b) Vandalism: 5 (days) x 183 (units) x $2, or $1,830; and 5 (days) x 2 (groups) x $10, or $100. The total: $1,930.
(c) The grand total: $4,540.
CONCLUSION OP LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the United States and judgment is, therefore, entered for plaintiff in the amount of four thousand five hundred forty dollars ($4,540).