HYDROMAR CORPORATION OF DELAWARE AND EASTERN SEABOARD PILE DRIVING, INC. (A Joint Venture), Plaintiff,

v.

UNITED STATES of America, Defendant.

Court No. 90–295 C.

United States Claims Court.

Feb. 4, 1992.

Eugene Schaffel, New York City, for plaintiff.

Reginald T. Blades, Jr., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

HODGES, Judge.

Plaintiff appeals the decision of the Corps of Engineers Board of Contract Appeals (Board) based on the Wunderlich Act, 41 U.S.C. §§ 321–322 (1988). Plaintiff filed a motion for summary judgment and defendant cross-moved. We find that the Board's decision was reasonable and appropriate.

## FACTS

The Board made extensive factual findings in this case. They are set out fully in the record. *Hydromar Corp. of Delaware and Eastern Seaboard Pile Driving, Inc.,* ENGBCA No. 48827, 89–3 B.C.A. (CCH) ¶ 21,898, 1989 WL 61818. Facts which give background to this case and which are not disputed by the parties are summarized below.

Hydromar Corporation of Delaware and Eastern Seaboard Pile Driving, Inc., a joint venture (Hydromar) was awarded a contract by the Corps of Engineers (Corps) for beach restoration and advance nourishment of a public beach in Duval County, Florida. The contract called for Hydromar to remove 1,500,000 cubic yards of sand from the ocean floor and to transport this material to the shore, where it became "beach fill." The unit price was $2.55 per cubic yard of fill, for an estimated contract price of $4,230,000.

The contract allowed 365 days for the job to be completed. The Notice To Proceed was received on May 12, 1978, but a subsequent modification extended the completion date by 163 days to October 22, 1979. The work was completed and accepted effective October 5, 1980, nearly a year late.

In addition to typical Corps of Engineers contract provisions concerning differing site conditions, this contract contained the following clause at Section 2A:

. . . .

4. EXCAVATION

4.1 *General.* . . . The characteristics of the materials in the offshore borrow area are indicated on the Core Boring Logs. . . . All excavation for beach fill shall be performed within the limits of the borrow area shown on the drawings. The Contractor shall excavate in a uniform and continuous manner. If ordered in writing, the Contractor shall change the location and depth of excavation within the borrow limits when necessary to provide the best fill material available.

. : . .

## 6. BEACH FILL

6.1 *General.* ... If rock or clay balls are encountered in the borrow area, the location of the dredging shall be immediately changed by the Contractor and any rock or clay balls deposited on the beach larger than 2 inches in diameter shall be removed from the site ... at the expense of the Contractor....

The Corps provided a borrow area 3,000 feet by 6,000 feet on the ocean floor about seven miles offshore. The contract permitted plaintiff to dig no more than 15 feet below the ocean bottom for the sand. The specifications included data on 18 core borings which had been drilled in an approximate 1,000-foot grid pattern in the borrow area.

One of the contract-approved methods for digging and transporting the sand was the use of a hopper dredge. The hopper dredge uses hydraulic suction to pick up sand and place it in the dredge's own holds, called hoppers. When the hoppers are full, the dredge is moved to the discharge area and the sand is pumped out through a pipeline to the beach. Hopper dredges use two methods to bring sand from the floor of the ocean to the hopper: (a) trailing dragheads, and (b) suction downpipes or bells.

*Trailing dragheads* are pulled along the ocean bottom in a path about six inches deep and seven feet wide. The hydraulic flow is assisted by the mechanical scraping action of the dragheads, which are pulled forward at a speed of one to three knots. *Suction downpipes* are flared at the bottom and used with the dredge in a stationary position. They depend on hydraulic flow, and to some extent gravity, to suck material up the pipe and into the hoppers. Plaintiff used suction downpipes.

On April 25, 1978, Hydromar's dredge (or barge), the HYDRO ATLANTIC, was put into drydock for a hull inspection by the United States Coast Guard. The Notice To Proceed was received on May 12, 1978. The dredge was released on May 24 and was sent to Hoboken, New Jersey for stability tests through May 30. It arrived under tow in Jacksonville, Florida on June 11, 1978 for final Coast Guard inspection. The Coast Guard issued a conditional certificate for the HYDRO ATLANTIC on August 16, 1978.

Hydromar began work on August 17, 1978 and continued with some interruptions until December 7, when its barge was brought in because of weather. While docked, it was inspected by the Coast Guard. Work began again on February 20, 1979 and continued again with interruptions until December 16. Plaintiff then ceased operations because of weather conditions and anticipated Christmas shut down. Work did not resume until April 2, 1980 due to extensive work ordered by the Coast Guard and the American Bureau of Shipping. The job was finished on October 5, 1980.

Plaintiff seeks $10,983,229 and release of liquidated damages because of differing site conditions resulting in weather delays and related expenses, and certification expenses. The Board found that Hydromar had "encountered differing site conditions to a relatively minor degree in the designated borrow area, even though those differing site conditions did not cause the great bulk of the delay in contract performance time or the specific instances of damages to dredging gear claimed...." *Hydromar*, 89–3 B.C.A. (CCH) at 110,186. The Board remanded the case to the Contracting Officer "for negotiations with the Contractor to establish the equitable adjustment in contract price and performance time to which the Contractor is entitled in accordance with this Opinion." *Id.*, at 110,-186.

. Plaintiff argues that the Board's findings were arbitrary, capricious, and so erroneous as to imply bad faith. According to plaintiff, the Board's findings are not supported by substantial evidence because the Board "failed to make coherent findings and, in certain areas, failed to make findings at all."

Thereupon, plaintiff cites 19 specific findings of fact by the Board which it believes to be arbitrary or capricious, or not supported by substantial evidence. Defendant points to an extensive investigation of Hy-

dromar's claim by the Board which "established actual site conditions substantially similar to conditions indicated in the contract documents." Defendant believes that Hydromar's case is an attempt to "relitigate factual issues decided by the board. Such an approach, which clearly runs counter to the applicable standard of review, should be of no avail to Hydromar in this appellate review process."

## STANDARDS OF REVIEW

■ When conducting a Wunderlich Act review, the Claims Court functions as an appellate tribunal. *Vista Scientific Corp. v. United States*, 808 F.2d 50 (Fed. Cir.1986). Conclusions of law are reviewed *de novo*, but conclusions of fact are binding on the court unless plaintiff can establish that they are not supported by substantial evidence or that the Board was arbitrary, capricious, or abused its discretion. *Vista Scientific Corp.*, 808 F.2d at 51; 41 U.S.C. § 321 (1988). Evidence is substantial if it can "convince an unprejudiced mind of the truth of the facts to which the evidence is directed." *Koppers Co. v. United States*, 405 F.2d 554, 186 Ct.Cl. 142, 149 (1968).

The Board's findings are presumptively correct. The burden of showing that findings are not supported by substantial evidence in the record is a "heavy burden." *JMT Machine Co. v. United States*, 826 F.2d 1042, 1044 (Fed.Cir.1987).

## THE BOARD'S FINDINGS OF FACT

We reviewed the Board's opinion and the record to which it refers, and we considered the arguments of counsel. The Board points out in its decision that "many factual doubts and inconsistencies [are] associated with this appeal.... We have based our findings on the preponderance of the evidence that we find credible and relevant."

The Board did a thorough job of developing this record. While reasonable persons could disagree on some of the factual issues, or wish that more information were available, these are not reasons for this court to reverse a Board's decision under the Wunderlich Act.

Plaintiff challenges 19 of the Board's 63 Findings of Fact in this case. The disputed Findings are discussed in summary form below. The numbers used are in the style of plaintiff's brief in support of its motion for summary judgment.

1. *Respondent was not aware before award of the contract that Hydromar would use the suction bell rather than the trailing draghead method. (Board Finding § 8)*

■ The Board found that respondent knew Hydromar would use the hopper dredge, and that it would perform the work by using tugs to move the HYDRO ATLANTIC. The Board also found that "Respondent's representatives were not aware before award of the contract that the Contractor would attempt to dredge the fill by use of a suction bell rather than by trailing draghead method...."

This is important because expert testimony shows that the draghead method would have been preferable for use in the open sea. During oral argument plaintiff argued that the Corps of Engineers inspected the dredge before awarding the contract, "spoke to the people on the dredge, saw the bells on the deck of the dredge, and fully well knew by what method Hydromar was going to perform this contract." Counsel acknowledged at oral argument that the Corps may not have had "an obligation to advise the contractor on the method he [had] to use, but ... if they *formally approve[d]* a particular dredge, as the dredge and the type of dredge to do this particular operation," then the Corps warranted that the method planned for use by the contractor was capable of performing the job. *See Somerset Constr. Co.*, ENGBCA No. 2986, 72–1 B.C.A. (CCH) ¶ 9425, 1972 WL 1898. Plaintiff argues that defendant's willingness to permit use of the suction bell method, which turned out to be inefficient, amounts to a differing site condition and a failure to disclose superior knowledge.

In support of its claim of caprice, plaintiff says the Board referred to certain ex-

hibits before it which made no mention of the method to be used. These were memos to file, for example, and the bid document itself. Plaintiff cites this as error. However, we suppose that this lack of mention was the Board's very point; i.e., the documents did not show pre-award that the suction bell method was to be used by Hydromar.

Similarly, the Board cites testimony of Mr. John Caruk as being insufficient to support this Finding. Mr. Caruk was Hydromar's project engineer. Plaintiff assigns error to the Board because Mr. Caruk's testimony was "with regard to the fact that the bell method of dredging *was* specifically discussed." Again, we think plaintiff misses the point: The Board did not find Mr. Curak's testimony to be credible.

If defendant did know that Hydromar intended to use the suction bell method, either by having seen the bells on board or having been told pre-bid, it is not clear that this would have mattered. Hydromar was not required to use the suction bell method. It was given wide discretion to choose an appropriate procedure.[1] The contractor's choice of dredging method was a business decision and a business risk.

We note that the Board nevertheless permitted some recovery because "the Contractor was not *prohibited* by the contract terms or the Contracting Officer from using the suction bell method, [so] differing site conditions that affected the suction bell method could merit an equitable adjustment, even if the same differing site conditions would not have affected the trailing draghead method...." (Emphasis supplied). *Hydromar*, 89–3 B.C.A. (CCH) at 110,182. On this basis, the Board directed

the Contracting Officer to consider an equitable adjustment based on increased loading times because of the change of condition evidenced by a "ribbon of clay."

*2. The contractor was not required to dredge in any particular part of the borrow area or to any particular depth. (Board Finding § 10)*

Here, the Board's only purpose seems to be to give appropriate background information in explaining the two principal reasons for using a dredge: (a) to remove material from a specific location, such as to deepen a channel for navigation or to remove polluted material, and (b) to obtain material for use elsewhere. This case involves the latter situation. The Board's point was that anywhere in the 18,000 square foot borrow area was available to Hydromar, and the contract so provides.

The contract also required that plaintiff move to another area if rock or clay balls were encountered. Plaintiff argued repeatedly in its briefs and during oral argument that it *planned* to dredge in the south and southeast quadrant, that it *expected* to dredge in those areas, and that perhaps the Government knew this. So far as we can establish, it did not matter to the Government where in the borrow area Hydromar dredged. It is true that plaintiff was limited to excavating 15 feet below the ocean floor (13½ feet in one area) but the record shows that an estimated 10,000,000 cubic yards of sand lay in the area 6,000 feet by 3,000 feet by 15 feet deep. The top 10 feet contained more than four times the amount of sand needed to perform the contract.

*3. There is an issue in the appeal over whether the contractor used an appropri-*

---

1. 5. TRANSPORT OF EXCAVATED MATERIALS
   5.1 *The method of transporting* the fill material from the borrow area to the beach may be accomplished in any one of the following methods:
   (1) Hydraulic pipeline dredge with a pipeline to the beach.
   (2) Hopper dredge type equipment with a mooring barge at the South Jetty and a pipeline from the mooring barge south along the beach with necessary booster pumps.

   ....
   (3) Hopper dredge or barge with pumpout capability filled by clamshell bucket, dipper dredge, or other type of excavating equipment and carried directly to a mooring system offshore of the beach to place the material via a pipeline on the beach.
   (4) Contractor volunteered upland borrow area with sand transported by truck or pipeline.

ate method of dredging the borrow material. (Board Finding § 12)

We discussed earlier the difference between the trailing draghead method and the suction downpipe method of dredging sand. Both expert testimony and common sense suggest that the trailing draghead method would have been more suitable in the open sea. Plaintiff is arguing that the Corps of Engineers approved the suction downpipe or bell method used by Hydromar, so the Board's Finding that an issue exists on this point is arbitrary and capricious.

Certainly, this was an issue in the case to the extent that much testimony and argument were directed to it. Phase One of this same project was completed by another company using the trailing draghead method with no apparent problems. The Board determined that Hydromar was entitled to some recovery for differing site conditions, even though its problems may not have occurred had dragheads been used instead of bells. Thus, perhaps the Board was using the term "issue" in a general sense as a dispute; certainly such a finding is not a reason to reverse the Board.

4. *The average payload of the HYDRO ATLANTIC was 3400 cubic yards. (Board Finding § 14)*

This has to do with the Board's use of the term "average payload" to describe the amount of sand put on the beach during each load. This figure perhaps should have been "average load" but plaintiff concedes that this has no importance to the decision.

5. *The dredge operators had no method to ascertain the depths at which they were dredging. (Board Finding § 16)*

Plaintiff's concern here is an implication that the Board thought Hydromar might have dug too deeply. The reference to uncertainty about depth does not seem to be a crucial factor in the Board's decision, but rather an observation on its part. Possibly the Board did suspect that plaintiff found it difficult to resist such temptation when it was digging clean sand. This would be understandable. The Board did

grant an adjustment for the unexpected "ribbon of clay" found within the 15 foot limit.

6. *The location of the dredge and the depth of excavation were reasons for the excess clay. (Board Finding § 21—See ¶ 5)*

7. *There was no positive way to determine digging depth. (Board Finding § 24—See ¶ 5)*

8. *The use of the bell method was incorrect and that the contractor's problem was caused by its failure to move to another section of the borrow area. (Board Finding § 26)*

This Finding reprints a letter from the Contracting Officer's representative in response to plaintiff's notification of problems with clay. The representative mentions several possible reasons, including the depth of excavation and plaintiff's use of the bell method. The representative suggests that plaintiff should move to another area within the borrow limits if it is hitting clay. The letter speaks for itself.

9. *The claim borings taken between July 3 and July 30, 1979 did not indicate subsoil conditions materially differing from those indicated by the contract borings. (Board Finding § 27)*

These are the claim borings taken in response to plaintiff's letter to the Contracting Officer. These borings were taken in a 500–foot grid in the area where Hydromar was working and having problems with clay. This Finding of the Board is supported by the claim investigation undertaken by the Corps of Engineers (Exhibit R–1). This report makes the following assertions, among others:

At 15–feet, the contract depth, both all data and contract data show contact with clay could have been expected. The major difference is the east-west trending ribbon of clay through the 'claim area,' in the south-central portion of the borrow area.

This ribbon of clay, not represented by the contract data, displaced 125,000 cubic yards of sand that was not available to the Contractor, or approximately 1 per-

cent of the total quantity of sand available. The entire borrow area contained 6½ times the required contract quantity. ... The ribbon of clay in the claim area was extensively sampled and found to be very limited in extent.

. . . .

... The contract data presented accurate site conditions to be expected by the Contractor. The borrow area was described as laced with thin clay layers and silty or clayey sand. In addition, stiff clay was defined within the excavation limits and shown to be more extensive with increasing depths. Sixty claim borings were made in addition to the original 18 contract borings. Although top of clay was found at a shallower depth in areas, this does not represent a significant change of conditions from the data presented in the contract.

The report acknowledges that a dispute exists in determining the "original ocean bottom." Plaintiff charges that the Government did not take such changes into consideration, or it unfairly reported these data. This was an area which had been dredged extensively, and the report indicates that efforts were made to take such changes into consideration. We cannot say that the Board's finding based on this report and testimony in the record was arbitrary, capricious, or unsupported by the record.

10. *The dives establishing the existence of clay within permissible dredge depths were unreliable. (Board Finding § 33)*

While the Board did find that divers' depth gauges are not reliable for close measurements, and that these measurements were not corrected for tidal stages, nevertheless it determined that "the dives did establish the existence of layers of clay which seemed to be within the permissible dredging depths at those locations." The Board reports the disagreement between the parties about the extent to which clay extended into the permissible borrow area, and it allows an adjustment in the amount that it determined could be justified.

11. *Between September 8 and 23, 1981, 11 additional claim borings were taken*

which still reflected subsoil condition essentially as indicated by the contract. (Board Finding § 37)

This is essentially the same Finding discussed in paragraph 9 of our decision, and for the same reasons, we cannot say that the Board's findings were not supported by substantial evidence in the record.

12. *Mr. Robert R. Buckley and Mr. Peter Caruk only had minimal experience in dredging and no experience in the use of the bell for dredging purposes and both had difficulty in remembering details. (Board Finding § 42)*

Mr. Buckley was president of Buckley & Company, Inc., the parent corporation of Eastern Seaboard. Mr. Caruk was the project manager for Hydromar.

The Board's Finding was that Mr. Caruk was educated in business and finance, and "had minimal experience with the technical aspects of construction and dredging." It found that *Mr. Mutch*, the president of Eastern Seaboard, had no experience with "the use of suction bells in the open ocean."

Plaintiff's brief acknowledges that "Peter Caruk did not have dredging experience himself, [but] he testified that people on board the dredge had ocean dredging experience." We reviewed the testimony of Mr. Caruk and Mr. Buckley, and they both "alluded to the lapse of time and the difficulty of remembering details," as the Board noted. The transcript does not indicate an excessive lack of memory on the part of either witness, but such is not always evident from the transcript. This is a matter which is determined properly by the trial judge.

13. *The section of the borrow area within which Hydromar planned to do the dredging was not chosen during the bidding period. (Board Finding § 47)*

The importance of this Finding is its tendency to show that Hydromar did not rely on particular contract "indications" in choosing the portion of the borrow area in which it would dredge. "A contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract

562

indicated what those conditions would supposedly be." *P.J. Maffei Building Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984) (citing *Arundel Corp. v. United States,* 515 F.2d 1116, 1128, 207 Ct.Cl. 84 (1975)).

Testimony from plaintiff's witnesses on this point is uncertain and at times conflicting. The Board made its finding on the basis of witnesses' credibility, an evaluation which the presiding judge is uniquely qualified to make.

14. *The depth measurements made by divers' depth gauges are not reliable for close measurement. (Board Finding § 52)*

The Board points out that such gauges are "marked in five-foot increments at the depths in issue and are intended for use with decompression tables based on ten-foot increments. Depths recorded by divers' gauges during some dives connected with this appeal, when compared to depths determined by more accurate measuring devices, showed discrepancies of five or six feet." This Finding is supported by evidence in the record.

15. *Mr. Lewis E. Hay's experience was limited. (Board Finding § 53)*

Mr. Hay was a geologist who testified as an expert witness. Plaintiff argues that none of Mr. Hay's testimony was seriously criticized or shown to be in error, "thus his testimony must be taken at full value." This does not follow. The Board notes that Mr. Hay had five years of professional experience at the time of his testimony, that his study of the problems experienced by Hydromar began in 1983, and that this was his only experience with subsoil conditions under the ocean. It is clear from Board Finding § 53 that careful attention was given to Mr. Hay's testimony, and his credibility was compared to that of other witnesses. The Board gave reasons for its determinations, and its conclusion was a reasonable one.

16. *Adjusting the depths of core borings to reflect contract bathymetry is not valid. (Board Finding § 54)*

This Finding is an evaluation of Mr. John Caruk's testimony. The Board notes that he was not a registered professional engineer and he had minimal previous experience with dredging. The Board found that neither Mr. Caruk nor Mr. Hay accorded appropriate significance to the references in the contract boring logs to "pockets" or "lenses" of clay. This is an appropriate determination by the Board of the relative weight to accord the testimony of various witnesses. The Board clearly was impressed with the expert testimony of Mr. August G. Stoeffler, who prepared a report and testified for the United States. The testimony of Mr. Caruk evidently suffered by comparison.

17. *While Mr. Morris J. Levin was personally credible the Board, did not find his analysis or conclusions persuasive. (Board Finding § 55)*

Mr. Levin was vice president, general counsel and corporate secretary of Schiavone Construction Co., Hydromar's parent corporation. He testified before the Board as a licensed professional engineer. Mr. Levin had no expertise in dredging, and little or no direct knowledge of events before or during contract performance, according to the Board. His testimony was offered to prove that wind and sea conditions did not delay or otherwise affect loading times. Thus, any loading time greater than 2½ hours must have been caused by clay alone. The Board found that Mr. Levin was "personally credible" but it did not find his analysis or conclusions to be persuasive. It is appropriate for the trial judge to make such determinations. We note that Mr. Levin's report was based in part on other evidence which perhaps the Board did not find credible.

18. *Mr. Douglas Rosen's testimony was credible, and there was no movement of sand into or within the borrow area so that only 125,000 cubic yards of sand was displaced by clay. (Board Finding § 57)*

Mr. Rosen was a geologist who prepared the differing site conditions claim investigation report. The Rosen report is discussed in our decision at paragraph 9. The Board specifically adopted Mr. Rosen's as-

sertion that no significant amount of sand moved into or within the borrow area after the dredging. This is admittedly a matter of dispute between the parties. Mr. Rosen's testimony and exhibits established the "ribbon of clay" referred to herein, and presumably served as the basis for the Board's determination that plaintiff should be granted a limited equitable adjustment. Rosen considered the ribbon of clay not to " 'represent a significant change of conditions from the data presented in the contract.' "

19. *Mr. Stoeffler was the most helpful and credible witness who concluded that the average loading time should have been five hours. (Board Findings § 59, 60, and 61)*

It is clear from the Board's opinion that Mr. August G. Stoeffler's testimony was the centerpiece of this case. To say that the Board had confidence in Mr. Stoeffler is an understatement. "Mr. Stoeffler was the most helpful witness in terms of explaining the significance of technical and factual evidence. He was exceptionally knowledgeable and credible.... He had extensive experience with using both trailing dragheads and suction bells with hopper dredges. Among many other projects, he managed at least seven beach nourishment projects, the type of work involved in this appeal. He had been in charge of CAC's performance of the Duval I project and was thoroughly familiar with the sea conditions at Jacksonville."

Because of the substantial weight accorded Mr. Stoeffler's testimony, we reviewed it critically. While plaintiff's counsel was effective in pointing out every possible shortcoming of his testimony, and all of the limitations on Mr. Stoeffler's sources, we cannot say that his credibility was damaged. We cannot say that the Board lacked justification for its reliance on Mr. Stoeffler. Not only do we concur in the Board's reliance on Mr. Stoeffler, but also in the Board's conclusions from his testimony.

## LOADING TIME

The record in this court will show concern about the Board's "jury verdict" approach to determining a reasonable loading time. The impression one has from reviewing the transcript of oral argument here is that the Board arrived at a reasonable loading time (4½ hours) which was beyond the range of reasonable loading times supported by the record (up to 3 hours).

Plaintiff asks the Board to rule that a 5–hour loading/unloading cycle, including an average 2 hour loading time, was reasonable. The contractor would have the Board then determine the actual loading time on the job, and award the difference to the contractor for delays due to clay (plus many other expenses not addressed here).

Mr. Stoeffler, the Government's expert on whom the Board placed great reliance, testified that 2½–3 hours would be a reasonable "net loading time." This testimony was elicited by plaintiff's counsel on cross-examination, and it has caused confusion in the record. Apparently, as used by plaintiff the term would mean "ideal loading time," shorn of any delays or problems. It does not include the time needed to move the barge as many as 15 times within each cycle. Because of the 15–foot depth limit, and the nature of dredging by suction bell, the barge must be moved periodically to acquire a complete load.

The record shows that the Board was justified in arriving at its 4½–5 hour reasonable loading time. Once the semantic distinctions among "gross" loading times, "net" loading times, "ideal" loading times, and "normal or reasonable" loading times are sorted out, the wisdom of the Board's determination can be discerned. Actual experience of plaintiff in this case with regard to loading times ranged as high as 8 to 10 hours, and the times generally increased as the contract wore on. Plaintiff argues that this was because of unexpected clay, but the proof is not there. For the most part, the *evidence* is not there.

It is clear first that the Board did not believe plaintiff used an average loading time of 2 hours in its bid. Second, the Board felt that the 2½ hour "ideal time" was relatively meaningless testimony. We agree. If the barge had not been required

to move about in order to fill the barge for one load, 2½ hours might have had some meaning. The expert found to be most credible by the Board testified that 5 hours for a single loading operation would be reasonable if the material were free flowing sand and the problems of dredging in the open ocean could be ignored. We believe that the Board considered this testimony and other testimony in the record concerning actual loading times established by documentary evidence, and concluded that 4½ hours for this contractor was reasonable. We agree that this finding is reasonable—even generous.

### CREDIBILITY

Board Findings 62 and 63a–s are important to an objective review of this case. Here, the Board lists each incident of plaintiff's claimed delay because of clay, and explains why each is not valid. Defendant's brief before the Board and plaintiff's point-by-point response are instructive. Both counsel argued their positions effectively, but a review of appellant's and respondent's briefs before the Board helps one understand why the Board ruled as it did.

Here is one example. The Government asked plaintiff to list specific instances of clay damage in connection with its claim before the Board. Item 10 of plaintiff's summary (Exhibit A–78) claims 94 hours and 10 minutes of delay between March 22 and March 26, 1979 resulting from one of the dragarms being stuck on the ocean floor. However, the Daily Report shows the dragarm at issue obtained a full load in one hour and 15 minutes before the dragarm was stuck in *sand*. The contractor responded to this discrepancy by stating that the "dragarm in question was located by Dave Hagen on March 31, 1979, identified as being in clay and recovered on September 23, 1979." Plaintiff cites to its exhibit A–3 for authority. Exhibit A–3 is a calendar maintained by the contractor during 1979. On September 23, 1979, the calendar shows that "Roy brought in the port elbow and hood that was lost before March, 1979—80% of port arm pipe is [the] only remaining dragarm equipment in the bor-

row area, excluding a few anchors." On March 31, 1979, the entry says only "Dave Hagen found dragarm on his own time with magnet." No mention is made of clay.

This is one of the clay damage claims which also was submitted to the Contracting Officer as a weather delay claim. Several such claims before the Board had been characterized at different times by the contractor as weather delay. Counsel's explanation for this in each instance was that weather damage was "the only way appellant would be able to receive the time extension. . . ." That is, the contractor realized that the Corps was not crediting clay for the changed condition, so the contractor submitted an excuse it thought the Corps would buy—weather delay. Counsel's use of such rationale several times in his arguments probably did not inspire the Board's confidence in plaintiff's credibility.

Defendant shows by references to contractor's logs and reports that plaintiff had trouble bringing up sand even in ideal conditions. For example, the Quality Control Report stated "material was good but could not get it to run." The Captain's Log stated, "Borrow yielding good sand but having to make several moves to get loaded." With regard to the Quality Control Report entry, plaintiff responds that the material in question was from outside the borrow area. "Appellant was digging outside of the borrow area looking for a clay-free area with permission of the Corps." Of course, this does not explain why the contractor could not get good material to run wherever it was located. Plaintiff does not explain the Captain's Log entry.

The record shows that loads of good sand took substantially more than the reasonable loading time of 2–3 hours which was urged on the Board and on this court by plaintiff. Load 353, for example, is described in the Deck Log as "sugar sand," presumably an ideal material to dredge. Yet defendant points out that the loading time for this load was 7 hours and 46 minutes. Plaintiff characterizes this as misleading because the dredge had to be

moved to a new location, and "that move took 4 to 5 hours (Ex. A–82)." Exhibit A–82 in the record is approximately 100 pages of "Local Climatological Data" which have no reference to the 4–5 hour move. It is not clear why the barge would have moved from "sugar sand" at all, but assuming there were such a move still this documents a 3 hour, 46 minute loading time under ideal conditions.

Defendant also was able to show that presence of clay, even where acknowledged, did not necessarily cause problems with loading the sand. Load 44, which had a very good loading time of 2 hours and 25 minutes, corresponds with a Quality Control Report stating, "Load 44 had a significant amount of clay in it." Plaintiff's response is a rather lame assertion that there is "no evidence that the clay found was not in pockets of clay less than six inches...."

## SUPERIOR KNOWLEDGE

■ Plaintiff alleges that the Government had in its possession core borings which it did not make available to the contractor. This reference is to borings which had been made by the Corps outside the designated borrow area of this contract. Plaintiff says that knowledge of these borings would have helped it estimate the cost of dredging within the borrow area. While it is not clear how the contractor would have used this information, presumably it would have extrapolated data from these borings for use in the borrow area.

Plaintiff cites *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 53 (1983) as follows:

> If the government possesses special knowledge which is vital to the performance of a contract but which is unknown and not reasonably available to a bidder who is thereby misled, the government must disclose its superior knowledge or be held liable....

Yet, plaintiff barely attempts to meet the standards included just in that quote; i.e., (a) vital to the performance to the contract, (b) unknown and not reasonably known to the bidder, and (c) a bidder who is thereby misled.

The contract drawings included the following disclosure: LOGS AND LABORATORY TEST DATA FROM OTHER BORINGS DRILLED OFFSHORE OUTSIDE OF THE BORROW AREA BUT IN THE NEAR VICINITY ARE AVAILABLE FOR INSPECTION AT THE JACKSONVILLE DISTRICT OFFICE. There is no indication that plaintiff looked at the information available to it. The Board was correct to dismiss such an argument.

## COAST GUARD

■ Plaintiff's final claim is for "certification expenses." This refers to the contractor's expenses of improvements and repairs to the barge ordered by the Coast Guard to bring the ship into compliance with Coast Guard regulations. To state the proposition is to highlight its complete lack of merit. The Board found that the certification expenses were not incurred because of differing site conditions, therefore not recoverable. We agree. Also, the contract includes the following clause:

> The contractor shall, without additional expense to the government be responsible for obtaining any necessary licenses and permits, and for complying with any applicable federal, state and municipal laws, codes, and regulations, in connection with the prosecution of the work.

The Board ruled, "There is no entirely logical method to measure the effects of the differing site conditions. Unless the parties agree on a different method or conclusion, the equitable adjustment is to be based on the cost and time for the net increase in loading time for loads which are shown on the load reports as taken in the area of the ribbon of clay [defined].... The actual average loading time for those loads ... is to be compared with the four-and-a-half-hour average loading time for that area determined above. The difference in the average times is then to be multiplied by the number of loads [with certain adjustments]." *Hydromar*, 89–3 B.C.A. (CCH) at 110,185.

## CONCLUSION

The Board's determinations of facts and law in this difficult case were entirely ap-

propriate. As noted earlier, they were generous. For the reasons stated herein, defendant's cross-motion for summary judgment is GRANTED and plaintiff's motion for summary judgment is DENIED. The Clerk will enter judgment accordingly. Costs to defendant.